[Civ. No. 39006. Second Dist., Div. Two. Aug. 28, 1972.]

IRVING BRECHER, Plaintiff and Respondent, v.
JACKIE GLEASON, Defendant and Appellant.

## COUNSEL

Munger, Tolles, Hills & Rickershauser, Christian E. Markey, Jr., and Dennis C. Brown for Defendant and Appellant.

Laurence M. Weinberg and Herman L. Bennett for Plaintiff and Respondent.

## OPINION

**FLEMING, J.**—Action for declaratory relief by Irving Brecher against Jackie Gleason to determine their respective rights in the reuse of "The Life of Riley" television films produced by Brecher and starring Gleason, a series originally telecast in 1949 and 1950. The trial court declared that Brecher had the right to reuse the films without further compensation to Gleason, and Gleason has appealed.

*Facts*

On 6 July 1949 Brecher secured an option to employ Gleason in the title role of "The Life of Riley" television series for as long as 364 weeks at a starting salary of $700 per week. The option agreement contained clauses setting out Gleason's responsibilities on the exercise of the option and provided that "upon the exercise of such option by me [Brecher] we shall enter into a formal contract embodying the provisions herein contained and such other terms and provisions as are usual and customary in contracts of this character and as shall conform with my contract with the sponsor and/or network including without limitation the usual act of God, strike, lockout and pre-emption clauses; the right to use your name, picture, photograph and other life likeness; usual indemnity provisions; a liquidated damage clause; the right to kinescope or otherwise film the live telecast; usual morality clause; and the right to change time, day or network."

On 23 August 1949 Brecher exercised his option, and it was agreed that Brecher could assign his rights under the contract to National Broadcasting Company. From September 1949 through February 1950 Brecher wrote and produced 26 "The Life of Riley" television films and Gleason was paid according to the terms of the option agreement. The films were telecast once each during a 26-week period beginning October 1949. Although the series won an Emmy award as the best film series on television, Brecher lost $52,000 on the production and discontinued the show.

Brecher and Gleason never signed a formal contract "embodying the provisions [of the option agreement] and such other terms and provisions as are usual and customary in contracts of this character," as called for by the option agreement. Samuel Sacks, an attorney and agent for Brecher, testified that the usual and customary contract terms for an actor's services in July 1949 gave the employer an unrestricted right to reuse films of the actor's services. Brecher testified that another star in "The Life of Riley" series, Rosemary DeCamp, has a written contract for additional compensation if the series should be rerun.

On 20 April 1950 Jerry Rolston, an attorney, wrote to Brecher's agent, Ann Rosenthal of the William Morris Agency:[1] "I stopped work in the preparation of the television contract, as well as the motion picture contract, since there is considerable doubt as to whether or not any additional options will be used.

"Just yesterday [Gleason's representatives] were in my office and I reminded them of the fact that the contracts had not been drawn and it was their opinion that no further work should be done on them until we know the result of Irving's trip to Milwaukee.

"You may rest assured that our clients will do anything and everything possible to aid Irving in this matter and we will more than abide by the oral agreements that were reached in your offices and of which we both have notes. However, our clients do not desire to incur any additional expense in contract preparation until they know that there is going to be an exercise of the options and compensation from which to pay the additional expense."

On 25 April 1950 Rosenthal wrote Rolston:

"I am quite sure that you as an attorney realize the importance of reducing understandings to writing and particularly in this instance where future uses may be involved, the agreements we arrived at during meetings should definitely be set forth in writing."

On 17 July 1951 Samuel Sacks wrote to Rolston:

"This will confirm my telephone conversation with you with respect to the understanding between Irving Brecher and Jackie Gleason and the re-use by Irving Brecher of the 'Life of Riley' film which includes Jackie Gleason.

"If Irving Brecher makes a deal for the release of the television motion pictures which embody Gleason's performance, then with respect to those pictures, Gleason is to be paid 10% of the gross proceeds received by Irving after first deducting distribution charges, agency commissions and the compensation paid to the personnel who rendered services in connection with said films at union and guild rates."

---

[1]Some of the letters quoted herein were marked for identification at trial but not formally admitted. We nevertheless consider them. Their existence and content were pleaded in Brecher's verified complaint. A verified assertion in a pleading is a conclusive concession of the truth of the matter pleaded. Such an assertion is not treated procedurally as evidence, but it may be relied upon by the parties and the court as part of the case. (*Walker* v. *Dorn,* 240 Cal.App.2d 118, 120 [49 Cal.Rptr. 362]; Witkin, Cal. Evidence (2d ed. 1966) § 501, p. 472.)

On 18 July 1951 Rolston replied to Sacks:

"I am in receipt of your letter of July 17th and hasten to correct any misunderstanding. I understood that we had agreed that in the event of re-issue of the 'Life of Riley' TV films, starring Jackie Gleason, Gleason would receive ten per cent of the gross proceeds received by Brecher after Brecher deducts the following: (1) distribution charges; (2) agency commissions; and (3) charges made by guilds and unions. It was never contemplated that compensation to be paid to other personnel, other than required and demanded by the guilds or unions, would be deducted. The particular union or guild charges that we contemplated were the A. F. of M. requirements, since there are no other guild restrictions in existence. . . .

"In other respects, your letter of July 17th is correct, so please re-confirm the fact that this letter embodies our understanding, and is to be the basis of compensation to Gleason in the event of any reissue of said films."

On 2 August 1951 Sacks wrote again to Rolston:

"Many thanks for your letter of July 18, 1951. There are several points which I should like to clarify as follows:

"1. The reference in your first paragraph to A. F. of M. should be, of course, not only to A. F. of M. but any recognized union or guild which has jurisdiction over any of the personnel who rendered services in connection with these films. . . .

"2. The allowable deduction should include, as an example, a person like Rosemary DeCamp. I don't have a copy of her contract but I understand that if, as and when a union acquires jurisdiction and requires payment for reuse of television film, then Rosemary DeCamp is entitled to such union payment even though the union regulation is not made retroactive.

"I trust that the foregoing conforms to your understanding too, and if it does, I would appreciate your reconfirming the same. Accordingly, the substance of my letter of July 17, 1951 as modified by your letter of July 18, 1951 and this letter shall constitute the understanding and is to be the basis of compensation to Gleason in the event of any reuse of the film embodying Gleason's services."

Some 17 years passed. Then on 4 March 1968 Brecher wrote to Gleason: "Happily, NBC's rights in 'Riley' under a license I granted in 1952, have just expired. The TV series we made is now cleared for re-runs. . . .

"You may recall that you will share, according to our agreement, in the

proceeds. It seems to me those proceeds might be greatly increased if your organization was actively involved in exploiting the films to our joint benefit, resulting in an ultimate capital gains consequence for both of us. . . .

"I very much hope you join me. Should you decide not to, you will still share in the re-runs, as agreed: 10% of the gross proceeds received by me after first deducting distribution charges, agency commissions and payments required to be paid to personnel by recognized unions or guilds."

On 6 May 1968 Gleason's attorney, Richard Green responded to Brecher's letter: "[Gleason's agent] is most emphatic in stating that he did not approve this deal and that this is why the arrangement was never confirmed. [He] informs me that he refused to approve any deal which involved so many deductions before the computation of Jackie Gleason's percentage. Jerry Rolston, who was not Jackie Gleason's attorney, was never authorized to OK a deal with these deductions.

"Under the circumstances I must advise you that you have no right to distribute the LIFE OF RILEY films containing Jackie's performances, because no agreement was ever reached on your acquiring that right. . . ."

At trial, Gleason denied that Rolston was authorized to represent him in negotiations with Brecher.

*Findings*

The trial court found that on the date of the option agreement, Brecher and Gleason were engaged in the entertainment industry; that it was usual and customary in the industry to include in formal contracts a provision that actors grant producers all rights without limitation to the results of the actors' services; that by entering the option agreement, rendering services, and receiving payment for services, Gleason gave Brecher unrestricted ownership of the results of his services; that notwithstanding lack of execution of a formal contract, the option agreement set forth the entire understanding of the parties and left no essential element open for future negotiation; that no agreement between the parties gave Gleason any right to further compensation in the event the television films were reused. The court concluded that Brecher had an absolute right to reuse the television films without payment of further compensation to Gleason.

*Contentions*

Gleason contends the parties intended the formal contract to embody terms for payment for reuse; therefore the parties should be required to negotiate those terms. Brecher contends there was a contract embodying

the usual and customary contract terms in the industry or there was no contract at all; in either event he is entitled to reuse the television films without further compensating Gleason.

*Discussion*

■ What did Gleason and Brecher intend on the subject of payment for reuse of television films at the time they agreed to contract on "usual and customary terms," and did their intention find expression in their agreement? In solving this problem the court is required to evaluate extrinsic evidence in order to determine what the particular words used in the contract meant to the parties themselves, for to a considerable extent words in a contract mean what the parties intended them to mean, and the action of the parties may speak louder in deciphering meaning than objective definitions of the words they used. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641]; *Crestview Cemetery Assn. v. Dieden,* 54 Cal.2d 744, 754 [8 Cal. Rptr. 427, 356 P.2d 171].) ■ Because the extrinsic evidence in this case is without conflict, this court, as well as the trial court, is required to make an independent determination of the meaning of the words in the contract. (*Parsons v. Bristol Development Co.,* 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ At bench, the parties' intent with respect to television payments under the contract may be logically deduced from the practical construction placed on the contract by the parties themselves, especially when that construction more or less contemporates the active phase of the contract and has become explicit prior to any controversy on the point. The extrinsic evidence points to a single conclusion: the parties intended Gleason to be compensated for reuse of the television films. That has always been Gleason's claim, and Brecher as much as conceded the point by negotiating for additional compensation in 1951 and writing his letter of 4 March 1968. An expert's opinion on industry practice carries a lesser weight on intent than does the conduct of the parties, for the expert cannot tell us the specific intent of the parties in the particular case. Here, the intent to compensate is clear. Although intent not manifested in expression may fail, in that the language of a contract governs its interpretation (Civ. Code, § 1638), yet if expression in a contract is ambiguous and susceptible to several meanings a court will adopt the meaning that most closely reflects the intent of the parties. Thus, proof of intent can color and delineate neutrality and obscurity of expression and thereby capture a particular meaning that ordinarily would not be visible in the expression itself. Here, intent has acted upon expression to create particular mean-

ing. We conclude that the construction placed on the contract by the parties gave a particular meaning to the expression "usual and customary terms," and under that meaning Gleason is entitled to compensation for reuse of the films on television. (*Lesh* v. *Lesh*, 8 Cal.App.3d 883, 890 [87 Cal.Rptr. 632].)

How much compensation is Gleason entitled to receive? On this point the parties reached apparent agreement in the negotiations conducted during 1951. Gleason, however, contends that attorney Rolston had no authority to negotiate on his behalf. If, after further proceedings, the trial court finds that Rolston properly acted within the scope of his authority, the 1951 agreement should be declared binding upon the parties as an expression of the terms the parties intended the formal contract to contain. But if the trial court finds that Rolston acted outside the scope of his authority, then, because the parties themselves have been unable to agree on the amount of compensation payable under the contract, the trial court should determine what amount is reasonable in the light of the circumstances and the situation of the parties as they existed at the time of their original contract in 1949. (*Cal. Lettuce Growers* v. *Union Sugar Co.*, 45 Cal.2d 474, 482 [289 P.2d 785, 49 A.L.R.2d 496]; *Forde* v. *Vernbro Corp.*, 218 Cal. App.2d 405, 407-409 [32 Cal.Rptr. 577].)

The judgment is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Herndon, Acting P. J., and Compton, J., concurred.

A petition for a rehearing was denied September 15, 1972.