# THIRTEENTH & WASHINGTON STS. CORP. v. NESLEN, et al.

No. 7875.   Decided March 16, 1953.   (254 P. 2d 847.)

See 52 C. J. S., Landlord and Tenant, sec. 458.  Failure of landlord to furnish heat as constituting eviction.  32 Am. Jur., Landlord and Tenant, sec. 259; 69 A. L. R. 1093.

*Albert J. Colton, Peter W. Billings, Fabian, Clendenin, Moffat & Mabey,* Salt Lake City, for appellant.

*Leonard W. Elton,* Salt Lake City, for respondents.

CROCKETT, Justice.

Defendants, a group of lawyers, vacated certain office space before their lease on it had run, claiming a constructive eviction. Plaintiff, their lessor, was unable to re-rent the space at the same rent until 8 months later and sued for loss of rent during that period. The trial court entered judgment for defendants. Plaintiff appeals, charging: that the evidence does not support the findings, and that the findings which were made do not constitute a constructive eviction.

The building involved, now known as the Darling Building, was formerly a large department store on Main Street in Salt Lake City. During the extreme scarcity of office space following World War II plaintiff essayed to convert part of it into an office building. Defendants negotiated with P. H. Kipp, plaintiff's agent, who assured them that the building would be made into a "first-class office building, to the extent the physical structure permitted" and be so maintained. Before remodeling was completed, March 27, 1948, defendants entered into a five-year lease on offices on the 3d floor and moved in during May of that year.

Various provisions of the lease and the rules incorporated therein, pertinent to matters in dispute on this appeal are:

"Lessees * * * shall not in any way obstruct the * * * entry, passages, * * * or elevators, or use the same in any other way than as a means of passage to and from their respective offices, * * * nor bring nor keep anything therein * * * which will obstruct or interfere with the rights of other tenants * * *."

"The building will be open from 8 a. m. until 12 p. m. Tenants desiring the use of office before or after these hours should apply at building office for permission."

"Night Watch—After 7 p. m. the building is in charge of the night watchman, and every person entering or leaving the building is expected to be questioned by him * * * if unknown * * *."

"Heat will be provided * * * from 8:00 a. m. until 9:00 p. m. whenever such heat shall, in the owners' judgment, be required for the comfortable occupation of said premises. Temporary failure to furnish heat shall not, however, be construed as an eviction of the tenant. * * *"

"The owners [lessors] * * * assume the charge of cleaning and keeping in order the halls and stairways and passageways of the building * * * [and doing] all janitor work upon the premises. * * *"

"The lessors shall be * * * the sole judge as to the amount of and time when heat and light shall be supplied * * * and * * * of the character and amount of the janitor and elevator service to be supplied."

In surveying the evidence to see whether the trial court was justified in holding that there was a constructive eviction, we review it, and every inference fairly arising therefrom in the light most favorable to the defendants, they having prevailed below.[1]

One of the major difficulties about which defendants complain is that near the time they moved in, a shoeshine stand and barber shop were established in the entrance and lobby, forming somewhat of an obstacle course which visitors and clients had to contend with and which actually confused some into thinking they had missed the entrance of the building. Plaintiff made some effort to alleviate this confusion by having signs showing the direction to the elevators, but it was not until after defendants moved out that the barber shop was partitioned off from the foyer. There were also some blocking of the passage to the stairway; this was accentuated about a year before defendants moved out when a beauty shop was also established in the lobby.

[1]See *Toomer's Estate* v. *Union Pac. R. Co.*, 121 Utah 37, 239 P. 2d 163.

Defendants also experienced serious difficulties with respect to the hours the building remained open. It will be noted that the second provision above quoted provided that the building would be open from 8 a. m. until 12 p. m. Notwithstanding this, the outer doors were locked at 8 p. m. each evening and on all holidays and Sundays. Plaintiff justifies this because of the provision that the night watchman would be on duty after 7 p. m. and question all unknown persons. Evidence adduced showed the necessity of lawyers receiving clients and doing part of their work in the evenings, and the inconvenience to all concerned in making arrangements to have someone (defendants had keys) at the door to let clients or other proper visitors in or out. Concomitant with this grievance of locking the building was the fact that no elevator service was provided after 8 p. m. When the attorneys and their clients had to use the stairway, it was often unlighted at night so that they had to feel their way up and down. There was also evidence that on occasions the stairway was used as a "latrine" and that the approaches to its lower landing were occasionally partly blocked by beauty parlor supplies, janitorial equipment and racks of clothing.

Lack of heat was another source of vexation. Defendants' evidence was that on frequent occasions during the winter the building was so cold that they, their employees and clients had to keep on their overcoats. Although, after the first winter, thermostatic controls were installed in the quarters, such discomfort persisted; further annoyance was experienced because the restroom facilities were unsanitary, continually foul-smelling, improperly ventilated and inadequately supplied with soap, towels and other essentials. After the beauty shop was set up, due to lack of proper ventilation, the aroma of beauty preparations penetrated to the floors above, mingling with the other odors to make a melange, unpleasant and unacceptable in an office building.

Numerous and repeated protests concerning these conditions were made and improvement in them promised. However, the situation continued to be highly unsatisfactory. Defendants inquired in other office buildings for space and finally procured suitable accommodations and on June 30, 1950, moved, paying the rent only up to the time they vacated. The lease had three more years to run. Plaintiff sued for the rent for the eight months the offices were empty before being re-rented, and would of course be entitled to recover unless the defendants were justified in claiming a constructive eviction.

Plaintiff asserts that "constructive eviction" is not available to defendants, contending:

1. That there was not a grave, substantial nor permanent interference by plaintiff with defendants' use of the premises;

2. That constructive eviction requires an intent to evict, which was not shown;

3. That the terms of the lease make the lessor the "sole judge" of certain of the services complained of and therefore plaintiff's act would have to have been wilful and wanton or wholly outside reason, which plaintiff avers defendants also failed to prove. and

4. That defendants did not abandon the premises as a consequence of the conditions complained of, nor within a reasonable time.

We consider these points in order:

1. Concerning the general law regarding what interference will constitute a constructive eviction, American Jurisprudence[2] has this to say:

"* * * any disturbance of the tenant's possession by the landlord, or someone acting under his authority, which renders the prem-

[2]32 Am. Jur. Landlord & Tenant, Sec. 246, p. 231.

ises unfit for occupancy for the purposes for which they were demised
* * * amounts to a constructive eviction, provided the tenant
abandons the premises within a reasonable time."

but properly adds this qualification:

"* * * To constitute a constructive eviction, the interference
* * * with the tenant's enjoyment of the demised premises must
be of a substantial nature and so injurious as to deprive him of the
beneficial enjoyment of a part or the whole of the demised premises."

Plaintiff argues that because the adverse conditions re-
lied upon by defendants were mainly omissions, and the
acts of others, they were not "interference by plain-
tiff." With this contention we do not agree. The
failure to do some act or to adequately perform it,
may render a building just as untenantable as affirmative
interference. The text in American Jurisprudence,[3] further
reads:

"an eviction may be based on the landlord's omission to act where it
is his duty to act."

Where the landlord authorizes conduct by another it is
imputable to him and he must bear the responsibility for it.
Plaintiff's agents could well foresee that the shoe-
shine stand, barber shop and beauty parlor installa-
tions would bring about the difficulties that were
encountered. The plaintiff is answerable for the natural
and probable consequences of the placement and operation
of these business, as well as for the direct consequences of
its own acts or failures to act.[4]

---

[3]32 Am. Jur., Landlord & Tenant, Sec. 248.
[4]See 52 C. J. S., Landlord and Tenant, § 480, p. 240; *Pembroke
Stationery Co.* v. *Rogers*, 41 Utah 411, 414, 125 P. 866; 1 Taylor,
Landlord & Tenant (1887) p. 195, "* * * to render * * * [the
landlord liable] the nuisance must be one that necessarily arises from
the tenant's ordinary use of the premises for the purpose for which
they let, and not be avoidable by reasonable care on the tenant's part."

2. The principle just expressed also applies to the plaintiff's second point; the contention that an intent to evict must be shown. In the case of *Barker* v. *Utah Oil Refining Company*, we stated:[5]

"* * * there is a 'constructive eviction when the [landlord], *without intent to oust* the latter, does some act which deprives the tenant of the beneficial enjoyment of the demised premises or materially impairs such enjoyment." (Emphasis added.)

Properly interpreted, this comports with the general rule as expressed by Tiffany,[6] that intent is,

"* * * ordinarily of a purely legal nature, inferred from the character of the landlord's acts. * * *"

Thus, an intent to evict may be implied whenever his conduct is such that it substantially deprives the tenant of the use of the premises for the purpose for which they were demised.

3. The fact that the lease made the plaintiff "the sole judge" of the amount of heat, light, janitor and elevator service to be furnished is of course to be taken into consideration. Such provision itself, however, must be weighed in the light of what is reasonable, necessary and customary in connection with the furnishing of similar services in office buildings of the character of the one in question. The plaintiff's "sole" judgment in the matter could not be wholly capricious, unreasonable or arbitrary so as to entirely, or even to substantially, deprive defendants of such services. Where the defect is so flagrant as to be wholly unreasonable, the contract terms would not protect the landlord from the duty to reasonably maintain such services nor from liability for his failure to do so.[7]

[5] 111 Utah 308, 178 P. 2d 386, 388.
[6] 1 Tiffany, Law of Real Property (1939) Sec. 142, p. 232. See *Hotel Marion Co.* v. *Waters*, 77 Or. 426, 250 P. 865, 868.
[7] See 17 C. J. S., Contracts, § 495.

It is true as plaintiff alleges that the trial court made no specific finding that, in the terms just discussed, the failures were flagrant, wanton or wholly unreasonable; the fact remains that he found they were inadequate and that, coupled with the other deficiencies complained of, they constituted a constructive eviction. The failure to make such a finding does not prevent consideration of these conditions, along with other factors complained of, in determining whether the cumulative effect of all was sufficient to establish a constructive eviction. The finding actually made, together with the conclusion that the constructive eviction was effected, fairly implies a finding by the court that the failures mentioned were unreasonable to the extent that they violated the terms of the lease. From the fact that the court found the issues in favor of the defendants and accepted their evidence, it appears that the testimony with respect to the unsatisfactory restroom facilities, the lack of enough heat and the unlighted stairway was such that the deficiencies in the services involved could only have been flagrant and unreasonable. Where findings as to propative facts are made from which must necessarily follow the existence of a required ultimate fact, the failure to expressly formulate a finding as to the ultimate fact is not prejudicial error.[8] The judgment cannot be held fatally defective because of failure to make findings explicitly in the language that "deficiencies in such services were flagrant and unreasonable."

It is not our problem to evaluate separately the conditions complained of. It may well be that various of them taken alone would not be of sufficient import to create a substantial impairment of the use and enjoyment of the premises. However, it is the cumulative effect of them all which must be considered in determining the soundness of the judgment. This cause was tried to the court and it was peculiarly his prerogative to determine whether the diffi-

---

[8]*Fouch* v. *Bates*, 18 Idaho 374, 110 P. 265; *Jessen* v. *Peterson, Nelson & Co.*, 18 Cal. App. 349, 123 P. 219.

culties were sufficient to constitute a constructive eviction of the tenants. He could consider among other things the nature and purpose for which the premises were to be used.

The law is a dignified profession involving the selling of one's services. Professional standards prevent a lawyer from advertising his talents, and as a consequence he is dependent upon other means of attracting and holding a clientele. In connection with the promise of a "first class" building, defendants had a right to expect that the entrance, corridors and offices would present a businesslike and attractive appearance consonant with the dignity and respectability of their profession and that the building services would also comport therewith. However, even Mr. Kipp, plaintiff's building manager, admitted that certain of the conditions fell below such standard.

The trial court having found the facts as it did and concluded that the grievances complained of were sufficient to constitute a constructive eviction causing defendants to vacate, this court will not reverse it so long as there is substantial evidence to support the findings.

4. But plaintiff maintains that even if it be assumed that otherwise there would be a basis for a constructive eviction, the defendants waited an unreasonable amount of time before leaving the premises and that they thereby waived their rights to so claim and vacate.

It is true that the troubles as to most of the defects complained of continued practically through the length of defendants' occupation and that during both winters defendants had heating problems but did not move out until early summer when such problems would not exist. However, repeated complaints were followed by promises from plaintiff's agents that the conditions would be improved. Defendants were justified in waiting to see if the promises would be fulfilled, especially in light of the "sole judge" provisions of the lease arrangement which would make haz-

ardous any precipitous abandonment of the offices. Defendants entered into the second year of their tenancy and found that the situation was aggravated by the presence in the foyer of the newly established beauty shop and the difficulties it brought, later learning on the advent of another winter that notwithstanding some efforts at improvement, their heating problems still remained.

Although subjection to unsatisfactory conditions for a short period of time, with hope for improvement, may not sufficiently deprive the tenant of the use of the premises to constitute an eviction, a long continuance thereof could —especially when the situation was burdened by the later addition of further complicating factors.

Then, too, it is uncontroverted that there was an extreme scarcity of first-class office space in Salt Lake City at the time. The court found, in accordance with defendants' evidence, that they moved from the Darling Building "as soon as they could find suitable quarters for their use as attorneys' offices." Thus, there appears no basis upon which to disturb the trial court's finding that the defendants did not wait an unreasonable time before moving.[9]

Affirmed. Costs to defendants and respondents.

WOLFE, C. J., and McDONOUGH, JJ., concur.

HENRIOD., J., concurs in the result.

[9]See *Frosh* v. *Sun Drug Co.*, 91 Colo. 440, 16 P. 2d 428; *J. C. Penney Co.* v. *Birrell,* 95 Colo. 59, 32 P. 2d 805; *Palumbo* v. *Olympia Theatres,* 276 Mass. 84, 176 N. E. 815, 75 A. L. R. 1114, 1119.