**P.H. INVESTMENT, Plaintiff and Respondent,**

v.

**Cathy OLIVER, Defendant and Appellant.**

No. 870501–CA.

Court of Appeals of Utah.

July 14, 1989.

Bruce Plenk (argued), Salt Lake City, for defendant and appellant.

James H. Deans (argued), Salt Lake City, for respondent and amicus curiae, Apartment Ass'n of Utah.

Edward R. Munson, Salt Lake City, for amici curiae, Utah Housing Coalition, Salt Lake Community Action Program, and Utah Issues Information Program.

## OPINION

Before BENCH and GARFF, JJ., and DEE[1], Senior District Judge.

DAVID B. DEE, Senior District Judge.

This case between landlord and tenant is an appeal by the defendant and tenant Oliver from an order of the circuit court consisting of a money judgment for unpaid rent, an order restoring the rented property to the landlord, and dismissal of Oliver's counterclaim for a refund of rent already paid. Oliver appeals, claiming breach of an implied warranty of habitability, which has not been recognized in Utah. Deferring at this time to the Legislature in the establishment of such a warranty, we affirm.

Oliver leased a residence from the plaintiff's predecessor in late 1986. The property was then in bad repair to the point of being dangerous, and its condition was never improved. An inspection by a Salt Lake City building official on February 19, 1987 disclosed numerous violations of the City's Uniform Housing Code and Uniform Code for the Abatement of Dangerous Buildings. The deficiencies included unsafe electrical circuits, tilted and rotted floors, holes in the walls, and a hazardous stairway. The official testified that he would condemn the building if it were unoccupied.

■ Without a warranty or other express contractual provision requiring the lessor to maintain the leased property, the duty of the tenant to pay rent is governed by the common law rules of *caveat emptor*[2] and independence of covenants to pay rent,[3] mitigated somewhat by the doctrine of constructive eviction. Oliver does not

---

1. David B. Dee, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(*l*)(j) (1987).

2. Latin for "Buyer beware!" this term refers to the traditional doctrine that the buyer must bear the consequences of purchasing defective property. The rationale underlying the doctrine is questionable in situations where the seller is in a better position to assure the quality of what is sold than the buyer, and its application has been curtailed in some respects as the law has developed. For example, when a merchant sells personal property, warranties are now implied by statute to assure minimal quality in the property sold; *see* Utah Code Ann. §§ 70A–2–314 through –316. In sales of services, a buyer can recover from a professional for services that fall below the standard of care. *Caveat emptor* has not, however, been modified in Utah by a similar rule applicable to leases. *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985); *Mitchell v. Pearson Enter.*, 697 P.2d 240, 247 (Utah 1985); 1 A.J. Casner, *American Law of Property* 3.45 (1952); R. Cunningham, W. Stoebuck, D. Whitman, *The Law of Property* 266, 301–03 (1984).

3. Traditionally, promises to pay rent were independent of other promises of the lease, with the result that the lessor could breach the lease, or the leased property could be severely damaged, without affecting the obligation of the tenant to pay rent. *See, e.g., General Ins. Co. of America v. Christiansen Furniture Co.*, 119 Utah 470, 229 P.2d 298 (1951); *Jespersen v. Deseret News Publishing Co.*, 119 Utah 235, 225 P.2d 1050 (1951); *Stone v. Sullivan*, 300 Mass. 450, 15 N.E.2d 476 (1938). This rule is based on an increasingly antiquated view of a lease as merely a property conveyance to which contractual doctrines, such as implied conditions, do not apply. The trend in this area is to view a lease as a contract in many respects, and thus, to hold that the tenant's obligations are conditioned upon the lessor fulfilling his part of the bargain. *See Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1075 (D.C.Cir.1970); R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* 265–66 (1984).

claim that she was constructively evicted, and at the time of suit she was apparently still living in the leased property, which would ordinarily negate a constructive eviction.[4] There is therefore no apparent basis under present law for the result which she seeks.

Oliver invites us to create an implied warranty of habitability to enable her to reduce her rent obligation according to the defects in the condition of the premises. However, we refrain at this time from judicially creating a new rule of such scope. As a general rule of policy,[5] the judicial lawmaking function is best suited to fleshing out general formulations of rules and principles and to filling in gaps between related laws and between laws and the facts of specific, real-world cases. There is always a degree of "open texture"[6] between the controlling but broadly formulated rule and the facts of a specific case

before the court. After traversing the open texture in multiple decisions, case law may be said to have grown, or rather evolved, but optimally only in a series of small, incremental steps, rather than in a single precipitous leap.[7]

Some of the principal reasons for our reluctance to make the leap proposed by Oliver lie in the fact that the judiciary has certain institutional disadvantages in embarking on a course of extensive legal reform. Court procedures and our constriction to the record made in a specific case leave us with only limited means of gathering the broad information necessary for informed legislation. The judiciary is also limited by the happenstances that bring cases into appellate litigation, making it difficult to formulate a coherent, comprehensive approach to a problem, since the means to do so are only haphazardly available.[8]

4. *Brugger v. Fonoti*, 645 P.2d 647, 648 (Utah 1982); *Thirteenth & Washington Streets Corporation v. Neslen*, 123 Utah 70, 254 P.2d 847 (1953).

5. Our holding is based on considerations of public policy, rather than on an inherent lack of judicial power. Separation of powers principles delimit the outer reaches of judicial lawmaking power, but changing the judge-made rules at issue in this case would not approach those outer reaches. *See Timpanogos Planning and Water Management Agency v. Central Utah Water Conservancy Dist.*, 690 P.2d 562, 568–71 (Utah 1984). The courts of many states have found alteration of these rules to be within the scope of judicial power, *see* Restatement (Second) of Property, 5.1 Reporter's Note 2 (1977) and Utah courts have not hesitated to overrule outmoded or ill-founded case law doctrines. *See Mickelsen v. Craigco Inc.*, 767 P.2d 561 (Utah 1989); *State v. Scott*, 732 P.2d 117, 120 (Utah 1987); *Travelers Express Co. v. State*, 732 P.2d 121, 124 (Utah 1987); *Allen v. Industrial Comm'n*, 729 P.2d 15, 21–24 (Utah 1986); *but see Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1283 (Utah 1987); *Wilson v. Manning*, 657 P.2d 251, 254 (Utah 1982); *see also Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (overruling the common law prohibition of tort recovery where the victim died).

Courts are thus engaged in an ongoing dialog with the Legislature in lawmaking, from a somewhat contrasting institutional frame of reference. *See* Traynor, *Reasoning in a Circle of Law*, 56 Va.L.Rev. 739, 741–44, 750–51 (1970). With their constant immersion in the law,

courts are in a better position than the Legislature to note defects in the law, and their partial independence from the shifting and perhaps, in rare instances, harsh or extreme tides of popular opinion gives them a perspective and an ability to assure a minimum of liberty to persons who may not be able to meaningfully assert their interests in the legislative process. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). Therefore, we abstain at this time from undertaking an extensive revision of the law in this area, not because judges today are unable to revise what judges of yesteryear have written, but because we believe that the Legislature is better able to undertake such a revision.

6. H.L.A. Hart, *The Concept of Law,* 121–132 (1961).

7. *See* Holmes, *Law in Science and Science in Law*, 12 Harv.L.Rev. 443 (1899) discussed in Elliott, *Holmes and Evolution: Legal Process as Artificial Intelligence*, 13 J.Leg.Studies 113 (1984).

8. *See* Breitel, *The Lawmakers*, 65 Colum.L.Rev. 749, 767–76 (1965).

The timing of this case illustrates our dependence on a fortuitous opportunity. The concept of an implied warranty of fitness in residential leases has been in currency for about thirty years, *see Pines v. Perssion*, 14 Wis.2d 590, 111 N.W.2d 409 (1961). It has taken all of those almost thirty years for a single case to arrive at a Utah appellate court and squarely present the issue. Since multiple cases would have to be

Moreover, even if opportunities and adequate information are present, the judiciary lacks the direct responsiveness of a legislature to the sovereign will of the people.[9] Legislation involves weighing often conflicting public policies, balancing interests, and making trade-offs, all of which should be accomplished, in keeping with our Constitutions, according to the will of the electorate. Judges in Utah courts are not chosen from among a wide range of candidates in an election between alternatives, and the independence of the judiciary, while essential to impartiality, leaves us somewhat aloof from public sentiment. This independence, if used to make law where underlying policy is not clear or is in conflict, could lead to the substitution of idiosyncratic views for the will of the electorate.

Establishing an implied warranty of habitability in this case would require us to weigh the conflicting interests of lessors and tenants, and would undoubtedly have an economic impact that we are unable to fully assess from the information now before us. We therefore exercise judicial restraint in the decision of this case and apply the established law. Since the application of that law by the trial court does not appear to have been erroneous, and, indeed, is not even challenged on appeal, we affirm.

This affirmance, however, intimates no approval of the legal rules on which it is based. Those rules are exceptionally senseless and anachronistic rules of the medieval common law. Caveat emptor may have been a workable rule in the agrarian economy of feudal England, where the tenant was perhaps more likely to know the condition of farmland he leased, and improvements to the land tended to be simpler and easier to inspect and repair. However, housing today is a product bought by consumers,[10] although its purchasers receive much less legal protection than purchasers of other products. There seems to be no functional reason why the remedies for the sale of defective rental housing should be so much less than those for the sale of defective goods or services, and the importance of shelter as a necessity of life makes that disparity seem all the more anomalous. Moreover, the overruling of *caveat emptor* with respect to torts by the lessor for the condition of the premises [11] leaves the tort and contractual duties out of correlation, and there would seem to be little logic in requiring a tenant to pay for the privilege of occupying property held in contravention of the lessor's tort duty. Finally, enforcing rent covenants so as to enable the lessor to realize a return on his property, however unkempt, seems at odds with the legislatively recognized need to combat blight and prevent urban decay.[12]

For those reasons and more, the law in this area badly needs reform. The Legislature is better equipped for that task than the judiciary, and we accordingly defer to allow the Legislature an opportunity to consider the matter.[13] Should it choose not to do so, however, the rules employed in cases such as this, and so lacking in rationale and justification, cannot be allowed to continue indefinitely.[14]

Affirmed.

BENCH, J., concurs.

decided to develop an implied warranty through case law, we fear that such development would occur in fits and starts as cases may arise in future decades. So protracted and sporadic a course of lawmaking poorly serves the needs for stability and predictability in the law. *See Wilson v. Manning,* 657 P.2d at 254 (Utah 1982).

9. *See Shelmidine v. Jones,* 550 P.2d 207, 209–10 (Utah 1976).

10. *Williams v. Melby,* 699 P.2d at 727 (Utah 1985), quoting *Javins v. First Nat'l Realty Corp.,* 428 F.2d 1071, 1074 (D.C.Cir.1970).

11. *Williams v. Melby; Hall v. Warren,* 632 P.2d 848, 850 (Utah 1981); *Stephenson v. Warner,* 581 P.2d 567, 568 (Utah 1978).

12. *See* Utah Code Ann., title 11, chapters 15 and 19 (1986).

13. *Blackwell v. Del Bosco,* 191 Colo. 344, 558 P.2d 563, 565 (1976).

14. *See* Friendly, *The Gap in Lawmaking—Judges Who Can't and Legislators Who Won't,* 63 Colum.L.Rev. 787, 792–799 (1963).

GARFF, Judge (dissenting):

I am compelled to dissent with the ultimate conclusion of the majority opinion, although the obvious ambivalence expressed in the rationale is not dissimilar to my own. However, when the legislature refuses or fails to address a social problem which injures so many so severely, the court should not hesitate to assert its rightful judicial authority to remedy an injustice affecting a large, yet relatively powerless, class of society—children and the underprivileged. The instant case presents a graphic illustration of the nature of the problem that mandates attention.

The appellant is a woman with few or no resources or income, who has seven children and was pregnant with an eighth at the time of this action.[1] The "structure" she leased from respondent was determined by the Salt Lake City Department of Building and Housing Services to be "substandard and dangerous and declared to be a public nuisance which must be abated by repair, rehabilitation, demolition, or removal." It had over forty housing code violations, including a dangerous, narrow, steep staircase; several shear cracks in the walls due to excessive settling; floors tilted because of inadequate foundations and supports; rotted floors around toilets plus holes in the floors elsewhere; collapsed ceilings in the bathroom and bedroom; uncovered electrical outlets and exposed wiring, some improperly spliced, creating multiple hazards; inoperative light fixtures; leaking toilets, faucets and a deteriorated shower stall; roof leaks; deteriorated and peeling plaster and paint, with holes in plaster in virtually every room; some window panes replaced by wood, with glazing cracked and broken, making it difficult and extremely expensive to heat the structure;[2] missing exterior siding; and a collapsed shed. Although the record does not indicate the ages of the children, it can be assumed from the total circumstances that all are young, some are infants, and their health and safety is in serious jeopardy under such hazardous conditions.[3]

Through the application of the doctrine of implied warranty of habitability, there is a way to effectively address this problem. The majority opinion, by affirming the lower court and deferring to the legislature, is merely perpetuating the injustice. So long as we cling to the old common law theory of *caveat emptor*, this pressing problem will defy solution. Utah is one of the few remaining states still adhering to this doctrine, which holds that there is no warranty by the landlord that the condition of the leased property is suitable for the use contemplated by the parties, and that the residential tenant takes possession of the premises "as is." *See* Restatement (Second) of Property § 5.1 comment b (1977). There is no need to repeat the discussion of these doctrines because the majority opinion has already addressed them and the need for change, and has concluded that "the law in this area badly needs reform." I agree. However, I disagree that we should continue to defer to the legislature.[4]

---

1. Appellant was ordered to pay $80.36 for rent from February 1, 1987 through February 9, 1987, plus $630.00 treble damages and court costs of $19.35.

2. Monthly heating bills in the winter sometimes ran as high as $235.

3. As a juvenile court judge for twenty-seven years, I heard thousands of neglect cases and hundreds involving similar deplorable conditions. This is *not* an isolated circumstance. It is a social problem of great magnitude and must be addressed. Further delay can only be measured in terms of greater human suffering and more neglected children.

4. The Apartment Association of Utah, at this court's invitation, submitted an amicus brief which stated:

    The Utah legislature has had several bills before it in the 1980's dealing with warranty of habitability. A 1984 bill co-drafted by the undersigned and modeled after the Texas law passed the Senate and failed by one vote in the House of Representatives. Other attempts have been less successful.

As the majority pointed out in its footnote # 5, Utah courts have not hesitated to overturn outmoded doctrines. Because the legislature has refused to act, the only other recourse Cathy Oliver and other similarly situated victims have is the justice system. To ask them to continue to be patient is completely unreasonable.

The adoption of the implied warranty of habitability doctrine is consistent with the intended direction of the Utah Supreme Court in *Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981), even though that was an action to recover for personal injuries. The court relied on *Stephenson v. Warner*, 581 P.2d 567 (Utah 1978), to point out that a landlord has a duty under the common law to exercise ordinary prudence and care in assuring that the leased premises are reasonably safe and suitable for their intended use. *Hall*, 632 P.2d at 850. The court then reasoned that the lease incorporated, by implication, the City of Vernal Uniform Building Code's safety standards, thus imposing a statutory duty of care on the landlord. *Id.* It also went on to say that "[t]his obligation is in accord with the contemporary approach toward leased habitations which emphasizes the contractual nature of the relationship between landlord and tenant instead of viewing a lease simply as a demise of real estate." *Id.* However, the court declined to rule on the issue of implied warranty of habitability, as urged by plaintiffs, because of the "abbreviated briefing" on the issue. *Id.* at 851.

I agree with the majority that the rules which presently represent the established law in this state on this issue are "exceptionally senseless and anachronistic." I find that they also violate fundamental fairness. Continuing to pay homage to a doctrine that has outlived its usefulness, at the expense of countless powerless, innocent victims, is simply wrong. My conviction is that adopting the doctrine of implied warranty of habitability, either judicially or legislatively, would not only be a giant step toward a "kinder, gentler" community, but would also be a significant *preventive* act to avert future human suffering and tragedy.