SANDALL et al. v. HOSKINS et al.

No. 6539.   Decided May 27, 1943.   (137 P. 2d 819.)

See 4 C. J. S., Appeal and Error, sec. 785; 26 R. C. L., 1090.

*Thatcher & Young,* of Ogden, for appellant.

*B. C. Call,* of Brigham, for cross-appellants.

*George M. Mason,* of Brigham, for respondents.

WOLFE, Chief Justice.

This is an appeal on the judgment roll by Axel Nelson, an intervenor by order of the court, from judgment entered against him on a counterclaim filed by the defendant, Herman Hoskins and Ella Hoskins. The issues raised by the complaint are not involved in this appeal; however, it is necessary to an understanding of the issues raised by the appeal to state part of the background facts.

From the findings and pleadings it appears that prior to March 25, 1940, Nelson was the owner of approximately 2,400 acres of land in Promontory, Utah. Portions of this land were adaptable to and were used for growing dry land grain. The balance was untillable grazing land. On March 25, 1940, Nelson entered into the following agreement with one John Landa:

"Between John Landa of Salt Lake City and A. C. Nelson of Promontory—John Landa leases from A. C. Nelson approximately 2400 acres twenty-four hundred for the purpose of grazing during the spring, fall, and winter 1940, and up to the first day of March, 1941,

for the sum of $325.00, two-hundred ten which is now paid and $115.00 to be paid later.

"John Landa

"A. C. Nelson

"P. S. It is understood the spring wheat is not to be grazed."

Landa grazed 2,000 head of sheep on this land for 25 days during the spring of 1940. He returned with the sheep in November, 1940, and grazed them for an additional 50 days. Prior to September 13, 1940, he paid the full $325 to Nelson. On September 13, 1940, Nelson leased the same premises for a term of five years to the respondents, Ella and Herman Hoskins. This latter lease between Nelson and Hoskins, which did not mention the Landa lease, overlapped the period of the Landa lease so that during the last fifty days when Landa grazed his sheep on the premises the Hoskins' lease was also in effect.

Two paragraphs of this lease between the Hoskins and Nelson are of particular importance to this appeal. The first deals with the rental which was to be paid. It provided:

"That the lessees deliver and turn over to the said lessor a one-half of all grain of any nature whatsoever that may be grown upon the above-described property during the terms of this lease, one-half of all hay of any nature whatsoever that may be grown upon the above-described property, and one-half of all alfalfa, grass, or clover seed of any nature whatsoever that may be grown upon the above-described property during the term of the lease."

The other provided:

"It is specifically and mutually agreed by and between the parties hereto that the said lessor shall, at any time within six (6) months from date hereof, have the right to sell said property, and the said lessees will forfeit and relinquish all of their rights in and to said property as provided by this lease. It is provided, however, that in the event the said lessees have done certain work in preparation of a crop, that they shall be reimbursed to the amount of the reasonable value of said work and for any other necessary and incidental expenses, pursuant to producing a crop on said premises that they have incurred."

Pursuant to this lease agreement the Hoskins took possession of the premises, prepared the land for planting and planted 320 acres with grain and incurred certain other necessary and incidental expenses while caring for the land. When Landa returned with his sheep in the fall and grazed them on the premises during November and December, the Hoskins had some discussions with Nelson concerning the matter, but no agreement as to a division of the rental was reached. The court found that Hoskins did not know of the Landa lease until after Landa brought his sheep onto the premises in November.

On about February 6, 1941, and within the six months' period from the date of the execution of the Nelson-Hoskins lease, Nelson sold the premises to Wayne Sandall and Clifton G. M. Kerr. Sandall and Kerr took immediate possession, plowed additional lands and did other work which it is not necessary to mention here. On June 26, 1941, the Hoskins brought an unlawful detainer action to recover possession of the premises from Sandall and Kerr. Rather than file an answer in the unlawful detainer action, Sandall and Kerr, alleging equitable grounds not material to this appeal, brought a suit in equity to enjoin the further prosecution of the unlawful detainer action. By order of the court, Nelson intervened so that the whole controversy could be settled in the one suit. The defendants, the Hoskins, filed a counterclaim against Nelson in which they alleged that they had prepared and planted some 320 acres of land with fall grain, repaired farm machinery and incurred certain other expenses in preparing to put in a crop. They also alleged that after the Hoskins had taken possession of the land a contract was entered into with Landa for the grazing of sheep on the premises and that Landa agreed to pay $325 for the same; that Nelson had collected all of this $325 and refused to pay any part of the same to the Hoskins. The value of the work done together with expenses incurred and the value of the grazing rights were alleged to be reasonably worth $3,500.

The court enjoined the further prosecution of the unlawful detainer action and held that the Hoskins' rights to the possession of the land were terminated by the sale to Sandall and Kerr. This part of the judgment is not involved in this appeal. The value of the work done, together with expenses incurred was found to be reasonably worth $256.25. The court also found that Nelson had made the lease with Landa prior to the making of the lease with the Hoskins. In addition the court held that:

"The said lease of September 13, 1940, between the said Axel Nelson and these defendants [the Hoskins] sets forth in detail the reservation for rent to be paid by these defendants to said Axel Nelson and the lease being silent on the matter of receipts from pasturage or grazing permits the Court finds that these defendants are entitled to all the rents, issues, and profits arising out of the land subject to the reservation for rent contained in said lease."

The court thus found that the Hoskins were entitled to all the grazing permits and pasturage. It, therefore, entered judgment against Nelson, for two-thirds ($217) of the total amount Nelson had received from Landa. The Hoskins were given only two-thirds of the money received from Landa because of the fact that of the total time (75 days) that Landa grazed his sheep on the premises, one-third of the time was in the spring of 1940, prior to the time that the Hoskins entered the picture. The court in its findings stated that no evidence had been offered concerning the comparative value of spring and fall grazing and that the court had assumed that they were of equal value.

Judgment was entered against Nelson for this $217 item (the Hoskins' portion of the rentals paid by Landa) and for $256.25 (the amount found to be owing to reimburse the Hoskins for their work and expenses in planting the crop prior to the sale to Sandall and Kerr). To secure the payment of these two sums, the court gave the Hoskins a lien on any and all sums due and owing or to become due and owing from Sandall and Kerr to Nelson.

On this appeal Nelson, the appellant, admits liability for the $256.25 item, but denies any liability for the $217 item. He also contends that the court erred in giving the Hoskins a lien to secure the payment of either of these two sums.

Since the appeal is taken on the judgment roll, our only concern will be whether the pleadings, findings of fact, and conclusions of law support the judgment. *Gray* v. *Defa*, 103 Utah 339, 135 P. 2d 251. The judgment for the $217 item is clearly based on the finding by the court that the lease, which sets out in considerable detail the rents to be delivered over to Nelson, does not reserve to Nelson any of the rights to pasturage or grazing rights. The appellant contends that this so-called finding is not a finding of fact but a conclusion of law. We do not think that we should be technical in requiring a court to make refined separations between Findings of Fact and Conclusions of Law especially where the basis for the so-called finding clearly appears in the findings. Findings of Fact as we have defined them mean "ultimate facts." But what is ultimate as compared with some basic fact or facts on the way or nearly ultimate is sometimes itself not easy to determine. And when one does think he has a hold of an ultimate fact he finds himself disturbed by a realization that often he has slipped over into a conclusion of law or that his so-called ultimate fact is a mixed statement of fact and law. And it could hardly be otherwise. Many facts which must be determined by deduction or inference from the basic facts require the application of a principle or proposition of law or an interpretation of a contract or a statute in order to arrive at either the ultimate fact or some fact on the way. In some cases factual deductions can be made from basic facts without the mental processes entertaining any legal proposition. Thus if "A" is found with a knife in his heart and "B" is seen rapidly running away from the scene of the crime and his (B's) finger prints are found on the knife, the deduction from basic facts to the fact that "B" plunged in the knife is arrived at without intervention of legal con-

cepts. On the other hand, in an Industrial Commission case, for instance, in order to determine whether "A" is the widow of "B" for the purposes of determining dependency, it may be necessary to determine whether they were married. Marriage may depend on whether a proper person performed the ceremony; this, itself, may depend upon resolving the legal question of whether such person had power to marry, etc. Yet the ultimate fact to be determined may be the fact of whether "A" was married to "B." We think it lends to clarity to think of ultimate facts as conclusions of fact or deductions to be made from one or more basic or evidentiary facts in order to arrive at the final facts although the stepping stone facts in between may require the application of legal propositions to resolve them. Certainly it has never been contended that the conclusions of law must contain every legal proposition as to what a judge or fact-finder determined has, in his mental processes, found necessary to apply to the evidentiary facts in order to arrive at an intermediary or ultimate conclusion of fact. The conclusions of law are those conclusions which the judge concludes flow from the ultimate facts as he finds them illuminated by subsidiary facts. What should really be contained in the findings of fact are those facts on each issue which are necessary to make flow from them the law conclusion or make such law conclusions intelligible. Often a conclusion of law adds nothing to the conclusions (findings) of fact. But in certain cases they are useful in interpreting findings of fact. Furthermore, what may be an ultimate, basic or intermediary fact in one case may be a conclusion of law in another. For instance, if "ownership" or "marriage" is only incidentally in issue, such would be nothing more than an ultimate fact to be set out in the findings if there was an issue in respect thereto. But if the status of marriage or ownership is the ultimate, and not just an incidental question to be decided, the determination of such issue may well be a conclusion of law.

In the instant case the court has based a finding on the construction of the provision of this lease agreement which

deals with the rent which is to be paid to the lessor. That provision, set out in full above, provides in substance that the lessees are to deliver and turn over to the lessor one-half of all the grain, one-half of all the hay, and one-half of all the alfalfa, grass or clover seed, of any nature whatsoever. The court concluded that this provision did not reserve to the lessor any rights to the pasturage or grazing permits on this land, and, since the provision sets out in detail the rents which were to be reserved to the lessor and did not include pasturage or grazing rights, the court concluded that the lessees were to have all of such pasturage and grazing rights. Thus, from the construction of this lease agreement the court concluded as a fact that the parties agreed that the lessees should have all of the rents, issues and profits except those expressly reserved to the lessor, and that the pasture and grazing rights were not reserved to the lessor. While this conclusion was arrived at by applying some legal concepts, it should be considered to be a finding of fact, especially in view of the fact that it sets out the basis for the conclusion reached.

The lower court was undoubtedly correct in its holding that this provision of the lease, which sets out in detail the reservation for rent to be paid to Nelson, must control in determining whether or not the Hoskins were entitled to all the pasturage and grazing rights in the lands. If the lower court was correct in holding that the lease did not reserve to Nelson these rights, then the Hoskins were entitled to all of said rights. Certainly the reservation of one-half of the grain does not reserve any grazing rights. The reservation of "alfalfa, grass or clover seeds of any nature whatsoever" is ambiguous, but when read in connection with other provision of the lease it is clear that it means alfalfa seeds, grass seeds or clover seeds, for it is subsequently provided that the lessees were to "stand all harvesting expenses which may be incurred in harvesting grain, hay, alfalfa seed and/or grass seed which may be grown" etc. The reservation of one-half of all the hay whatso-

ever likewise cannot be construed as including grass which could not be harvested. Hay commonly means grasses or feeds which have been harvested. Further, how could the lessees deliver and turn over to the lessor one-half of the grass and other forage which might grow on the grazing lands? This possibly could be done by permitting the lessor to graze the lands, but other provisions of the lease seem to negative the possibility that this was intended. The lease provides that the lessees and the lessor were to both put certain pigs, calves, and chickens on the land and that the increase from these animals was to be divided equally. It. is then provided "that said parties thereto respectively shall stand their prorata share of the costs of the feed necessary to care and mature the pigs, calves and chickens." It would thus appear that it was not contemplated that they were to be fed from the produce raised on the lands. Other surrounding circumstances which may have appeared in the evidence may have aided the lower court in coming to its conclusion. We do not have the evidence before us, but we do not think that the court was in error in its holding that the lease was silent on the question of pasturage, and grazing permits.

However, the case must be reversed for other reasons. The findings state that no evidence was given as to the fair and reasonable value of these grazing rights or as to the relative value of the spring and fall grazing. The holding that the Hoskins were entitled to all of the fall grazing rights does not dispose of the necessity of ascertaining the value of these rights. The court apparently proceeded on the theory that the Hoskins were bound by the contract price for these grazing rights agreed upon by Landa and Nelson. This is erroneous. The Hoskins were not a party to that contract and have no rights under it. However, in any lease agreement for a term of years there is an implied covenant of quiet possession unless there is an express provision to the contrary. *Heywood* v. *Ogden Motor Car Co.*, 71 Utah 417, 266 P. 1040, 62 A. L. R. 1232; Thompson on Real Property, Vol. 3, Sec. 1280. The facts which

give rise to this implied covenant are all pleaded—the lease agreements are both set out in full and the breach of this covenant is proved by the finding that Landa grazed his sheep on these premises in November and December by virtue of his lease agreement with Nelson. According to an early holding of this court, the measure of damages for the breach of an implied covenant of quiet possession is the value of the thing destroyed. *Utah Optical Co.* v. *Keith,* 18 Utah 464, 56 P. 155. This accords with what may be termed the majority rule. According to the note in 62 A. L. R. 1311 the majority rule is to the effect that "compensation shall be given for such loss as may be the natural and direct consequences of the breach" of the covenant of quiet possession. The case must be reversed and remanded so that the value of the grazing rights together with any other direct injuries suffered by the Hoskins as a result of the breach may be ascertained.

The court also erred in giving the Hoskins a lien to secure the judgment which they recovered. The contract between the Hoskins and Nelson did not provide for such a lien and there is no statute which creates one. While under certain circumstances equity courts may create a lien where none exists, this may be done only upon a showing of equitable facts warranting such an action. See 33 Am. Jur. 430; 37 C. J. 319. In the instant case there are no findings of fact made which would support an equitable lien arising by declaration of the court out of general principles of equity and justice.

The judgment as to the $256.25 item is affirmed. Judgment as to the $217 item is reversed and remanded for a determination of the damages which the Hoskins are entitled to recover from Nelson. That part of the judgment creating a lien to secure the payment of either of these sums is vacated. Costs to the appellant.

LARSON, McDONOUGH, and WADE, JJ., concur.

MOFFAT, J., concurs in the result.