RICHARD BARTON ENTERPRISES, INC., a California Corporation, dba California Packaging, and Richard Barton, Individually, Plaintiffs, Appellees, and Cross–Appellants,

v.

John F. TSERN and the Tsern Family Trust, Defendants, Appellants, and Cross–Appellees.

John F. TSERN and the Tsern Family Trust, Third–Party Plaintiffs,

v.

KIMBALL ELEVATOR COMPANY, a California Corporation, Third–Party Defendant.

Nos. 940295, 940321.

Supreme Court of Utah.

Aug. 6, 1996.

Rehearing Denied Dec. 12, 1996.

Donald J. Winder, Robert D. Tingey, Salt Lake City, and Michael J. Cappelli, Laguna Niguel, Cal., for Bartons.

John T. Anderson, Salt Lake City, for Tserns.

Russell C. Fericks, Salt Lake City, for Kimball Elevator Co.

STEWART, Associate Chief Justice:

Defendants John F. Tsern and the Tsern Family Trust (collectively "Tsern") appeal a judgment awarding plaintiffs Richard Barton and Richard Barton Enterprises (collectively "Barton") a rent abatement under a commercial lease and the cost of repairing an elevator. Barton has cross-appealed the trial court's award of attorney fees and interest. We affirm.

## I. FACTS

On November 21, 1991, Barton and Tsern entered into an agreement titled "Earnest Money Receipt and Offer to Lease," and on November 27, 1991, the parties executed a lease pursuant thereto for the first and second floors of a commercial building in downtown Salt Lake City. Barton agreed to pay rent at the rate of $3,000 per month for the one-year lease. The lease required Tsern to deliver possession of the premises to Barton on December 1, 1991. On November 27, Barton paid Tsern $9,000, covering the first and last months' rent and a $3,000 security deposit. Barton also paid an additional $3,000 as earnest money for an option to purchase the entire building.

The terms of the earnest money agreement were expressly incorporated into the lease. The lease provided, "[T]he 'Earnest Money Receipt and Offer to Lease' dated November 21, 1991, shall be attached to this lease as an addendum. All terms and conditions are binding to [sic] both parties." Added to the terms of the printed earnest money form were the typed words, "Other than stated in lines 32 and 33, Tenant shall accept the building in 'As Is' condition." The language on lines 32 and 33 required Tsern to repair the building's leaky roof and the freight elevator to "good working order."

Barton's purpose in leasing the building was to establish an antiques dealership. The business inventory included large architectural pieces that, because of the dropped ceiling of the main floor and other limitations, had to be stored on the second floor. For that reason Barton required a freight elevator to transport the large, heavy pieces to the second floor. Barton's need for the elevator was communicated to Tsern repeatedly, both prior to signing the earnest money agreement, when Barton became aware that the elevator was inoperable, and after the lease was executed and Barton took occupancy of the leased premises.

Barton took possession of the ground floor on December 1, 1991, but could not obtain possession of the second floor until December 20, when a holdover tenant finally vacated the floor. The elevator was wholly inoperable, and Tsern had neither repaired the elevator nor entered into a contract to have it repaired. Moreover, the roof had not been repaired. The elevator remained inoperable until January 9, 1992, when Kimball Elevator Co., pursuant to a time and materials contract with Tsern, made certain repairs to the elevator. On Tsern's instructions, however, Kimball made only those repairs necessary to make the elevator operational in the sense that it would "go up and down." Tsern strictly limited the amount of money he would pay Kimball for repairs to $5,000 and expressly refused to authorize a number of repairs that Kimball stated were necessary to make the elevator operate reliably and safely. The strict limitations placed on Kim-

ball's repairs and the failure to authorize additional needed repairs were not communicated to Barton. In fact, Tsern instructed Kimball not to mention those limitations to Barton.

The elevator operated from January 9, 1992, until January 24, 1992, when a city inspector ordered it shut down. After Kimball made an additional repair required by the city inspector on February 13, the elevator again operated until March 14. On April 10, a state elevator inspector found that the elevator was not in compliance with state law, directed Tsern to correct nine violations, and ordered the elevator shut down until it could pass a state safety inspection. Apparently believing that Barton intended to exercise its option to purchase the building, Tsern refused to spend the $5,552 to make those repairs. During the term of the lease, Barton continually demanded that the elevator be properly repaired. It never was and did not operate at all after March 14, 1992.

On December 10, 1991, Barton and Tsern each sent the other a communication concerning the possibility of a rent abatement. As already noted, at that point Barton had not yet obtained occupancy of the second floor because of a holdover tenant, the leaky roof still had not been repaired, and the elevator was inoperable. Barton suggested a rent abatement because of the difficulties. Independent of that request, Tsern on his own suggested a 50% rent abatement, but Barton never accepted his proposal. The parties never agreed on a rent abatement amount, nor did they specify which of Barton's claims would give rise to an abatement. Nevertheless, the trial court found that the parties had "agreed in principle" to the "concept" of a rent abatement, even though they had agreed neither to the amount of an abatement nor even to which of Barton's claims of noncompliance with the lease should qualify for an abatement.

Barton tendered less than the full rent for the months of January and February, and Tsern cashed the checks but maintained that he was entitled to the full rent of $3,000 for each month. Because the elevator operated during the latter part of January and the early part of February, Barton tendered full rent for February on February 1, minus a minor offset for something unrelated to the elevator. On April 15, 1992, Barton filed a complaint for a declaratory judgment to establish Tsern's legal duty to repair the elevator. Tsern counterclaimed with a three-day notice to pay the rent in full or quit the premises. The counterclaim was dismissed for reasons not now pertinent. Mr. Barton later gave notice that he was exercising his option to purchase, and to cure any possible rental defaults, he deposited $19,000 with the court on October 29, 1992. On November 30, 1992, the court ruled that Barton could exercise the option to purchase prior to the conclusion of the bench trial on his declaratory judgment claim.

In its final judgment, the court found that the elevator had not been repaired to "good working order" as required by the lease, and entered judgment against Tsern for the cost of repairing the elevator to that standard. Citing *Wade v. Jobe*, 818 P.2d 1006 (Utah 1991), the court also ruled that although Barton and Tsern had never agreed on the amount of a rent abatement, Barton was entitled to have the rent abated to $2,000 a month and, in addition, that Barton's damages plus accrued interest should be deducted from the purchase price of the building. Finally, the court entered judgment against Tsern for attorney fees in the amount of $100,000.

On this appeal, Tsern asserts (1) that Barton's covenant to pay rent was independent of all Tsern's covenants and that the trial court erred in awarding Barton a rent abatement, (2) that Barton's exercise of the option to purchase extinguished Tsern's obligation to repair the elevator, and (3) that the trial court's ruling that Kimball had not breached its contract with Tsern to repair the elevator was error because that ruling was inconsistent with the ruling that Tsern had failed to have the elevator repaired to "good operating order." On cross-appeal, Barton contests the trial court's calculation of attorney fees and its award of interest to Tsern on the option price.

## II. RENT ABATEMENT UNDER A COMMERCIAL LEASE

Tsern contends that the trial court erred in ruling that it could fix an amount for the

abatement of rent based on that court's finding that the parties had agreed to the "concept" of rent abatement during the time the elevator was inoperable but not to the amount. In the alternative, Tsern contests the trial court's ruling that Barton's covenant to pay rent was dependent on Tsern's compliance with the covenant to repair the elevator. Barton contends (1) that there was an oral agreement with Tsern to abate rent, and alternatively (2) that Barton was entitled to abatement on the ground that Tsern violated an implied covenant of suitability of the building for the intended purpose and, in any event, that the covenant to pay rent was dependent on the covenant to repair the elevator.

█ It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract. *See Pingree v. Continental Group of Utah, Inc.,* 558 P.2d 1317, 1321 (Utah 1976); *Valcarce v. Bitters,* 12 Utah 2d 61, 362 P.2d 427, 428 (1961). An agreement cannot be enforced if its terms are indefinite or demonstrate that there was no intent to contract. *Valcarce,* 362 P.2d at 428; 1 Joseph M. Perillo et al., *Corbin on Contracts* § 4.3, at 569 (rev. ed. 1993).

The trial court found that the parties "agreed to the *concept* of a rent credit" (emphasis added) but did not agree on an amount. Communications between the parties concerning a possible rent abatement began on December 10, 1991. At that time, Tsern had not repaired the elevator or even contracted to have it repaired, and a holdover tenant still had possession of the second floor. Barton therefore could have repudiated the lease. Barton proposed a rent credit, and Tsern was amenable to the general idea. Initially, Tsern suggested a 50%, or $1,500, rent abatement. Barton did not accept the offer but counter offered by proposing a rent credit because of the holdover tenant's occupancy of the second floor and for "any further time necessary to repair the elevator." Discussions continued into January. Tsern then asserted that Barton was obligated to pay full rent, and Tsern continued to so contend through the trial and this appeal.

The lease does not explicitly provide for a remedy in this situation. The only portion of the lease which is conceivably applicable is paragraph 9.6, which reads as follows:

In the event of [certain] *damage* ... and Lessor or Lessee repairs or restores the Premises pursuant to the provisions of this Paragraph 9, the rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired.

The paragraph provides a remedy only in the event of damage to the premises and has no application to this case. This case does not involve damage to the property.

Having found that the parties had not agreed on the amount of an abatement, the trial court nevertheless ruled that it could fix a reasonable amount because the parties had agreed to the "concept" of a rent abatement.

█ Tsern argues that the trial court erred in supplying a requisite term of the proposed modifications. We agree. We first observe that because no finding of fact is challenged, the issue is one of law. Accordingly, we do not defer to the trial court's ruling. The only issue, given the trial court's findings, is whether the parties agreed on each of the necessary elements of a valid modification. We hold that they did not.

█ Courts may not impose a modification of a lease to which the parties have not agreed and, a fortiori, may not do so when the parties have explicitly disagreed as to the essential terms thereof. A valid modification of a contract or lease requires "a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness." *Valcarce v. Bitters,* 12 Utah 2d 61, 63, 362 P.2d 427 (1961); *see* Restatement (Second) of Contracts § 33(1) (1981). Modification of such terms as the amount of rent must be agreed upon in a modification of a lease agreement. As Corbin notes, when parties have not agreed on a reasonable price or a method for determining one, "the agreement is too indefinite and uncertain for enforcement." Joseph M. Perillo et al., *Corbin on Contracts*

§ 4.3, at 568 (rev. ed. 1993); *see Pingree v. Continental Group of Utah, Inc.,* 558 P.2d 1317, 1321 (Utah 1976) (holding option to renew in lease that provided for rental amount to be negotiated but not to exceed specified amount "too vague and indefinite to be enforceable"). Barton and Tsern did not agree as to the amount of the abatement, either expressly or impliedly.[1]

As an alternative to the lease modification ground for abating rent, the trial court also ruled that the covenant to pay rent was dependent on the lessor's compliance with its covenant to repair the elevator. Tsern argues that the trial court erred in so ruling and that a lessee's covenant to pay rent is independent of a lessor's obligations once the lessee takes possession of the premises. *See General Ins. Co. of Am. v. Christiansen Furniture Co.,* 119 Utah 470, 229 P.2d 298 (1951); *Jespersen v. Deseret News Publishing Co.,* 119 Utah 235, 225 P.2d 1050 (1951); 3A Arthur L. Corbin, *Corbin on Contracts* § 686 (1960); 6 Samuel Williston, *A Treatise on the Law of Contracts* § 890 (3d ed. 1962); *see also P.H. Inv. v. Oliver,* 778 P.2d 11, 12 (Utah Ct.App.1989). He argues that the trial court consequently erred in ruling that the contract doctrine of mutually dependent covenants governed and that Barton's obligation to pay rent was dependent on Tsern's covenant to repair the elevator. Specifically, he relies on *King v. Firm,* 3 Utah 2d 419, 285 P.2d 1114 (1955), which held that a lessee's covenant to pay rent was wholly independent of the lessor's covenant to make repairs even though the lessee had paid for repairs and the lessor had not reimbursed the lessee.

At common law, a lease transferred an interest in land to the lessee. Although a lease covenant to pay rent at common law was governed partly by the law of contracts and partly by real property law, a lease was considered primarily a conveyance of an interest in land. Williston, § 890, at 587, 590. Under principles of property law, the lessor's covenants were independent of the lessee's covenant to pay rent. Williston, § 890; *Corbin,* § 686. This doctrine originated in an agrarian society in which the estate in land was the most important feature of the real estate lease. The lessor was required to deliver the right of possession to the lessee, and the lessee was required to pay rent, even if the lessor failed to comply with an obligation imposed by a covenant in the lease. Each party had an independent action for breach of a covenant by the other party, Williston, § 890, at 590, but a lessor's breach of a covenant did not relieve the lessee of the obligation to pay rent.

The doctrine that lease covenants are independent obligations was established prior to the development of the doctrine of mutually dependent covenants in contract law and often caused harsh results. Williston, § 890, at 585–88. Eventually, the common law rule was mitigated to some extent by the fiction of constructive eviction, which allowed a lessee to stop paying rent if a lessor's breach of a covenant or warranty was tantamount to eviction of the tenant from the premises. This Court first modified the rule by holding that a breach of the implied covenant of quiet enjoyment to which all leases are subject[2] could constitute a "constructive eviction" and thereby relieve a tenant of the obligation to pay rent. *Thirteenth & Washington Sts. Corp. v. Neslen,* 123 Utah 70, 254 P.2d 847 (1953); *see also Brugger v. Fonoti,* 645 P.2d 647 (Utah 1982).

To establish a constructive eviction, however, the lessee had to vacate the entire leasehold, and only then could the lessee withhold rent. *See Brugger v. Fonoti,* 645 P.2d 647 (Utah 1982); *Thirteenth & Washington Sts. Corp. v. Neslen,* 123 Utah 70, 254 P.2d 847 (1953); *Barker v. Utah Oil Ref. Co.,* 111 Utah 308, 178 P.2d 386, 387–88 (1947); *accord Tregoning v. Reynolds,* 136 Cal.App. 154, 28 P.2d 79 (1934); *Shindler v. Grove Hall Kosher Delicatessen & Lunch, Inc.,* 282

---

**1.** Clearly there was no implied agreement. Tsern insisted that Barton pay the full amount stated in the lease. Barton tendered less than the full amount each month except for the month of March when it appeared at the time rent was paid that the elevator was operational. Even then, however, Barton withheld a small amount for reasons unrelated to the elevator.

**2.** *See Sandall v. Hoskins,* 104 Utah 50, 59, 137 P.2d 819 (1943); *Heywood v. Ogden Motor Car Co.,* 71 Utah 417, 425, 266 P. 1040 (1928).

Mass. 32, 184 N.E. 673 (1933); *see also* 2 Richard R. Powell, *Powell on Real Property* § 232(1) (1994). For example, in *Thirteenth & Washington Streets,* a group of attorneys leased office space in a commercial building. The lessor impeded their use of the premises by obstructing the entrance to the building so that clients could not find the lessees' offices and by locking the front doors and shutting down the elevator prior to the close of the lessees' business day. This Court held that the landlord's failure to provide access to the leased premises during business hours was a breach of the covenant of quiet enjoyment and constituted a constructive eviction from the premises. On that rationale, the lessees were entitled to abandon the premises and withhold rent.

 The *common law rule of independent covenants* was further modified by the rule that a lessee who abandons only a portion of leased premises that is rendered unusable is constructively evicted therefrom and may withhold a proportional share of the rent without abandoning the entire premises. Corbin states: "Continued enjoyment of possession is a condition, even though not expressly so provided, of the tenant's duty to pay rent or to perform his other covenants. Eviction from possession of any substantial part of the premises goes to the essence and operates as a discharge of the tenant's duty." *Corbin,* § 686, at 241; *see, e.g., Dennison v. Marlowe,* 106 N.M. 433, 744 P.2d 906, 910 (1987); *Minjak Co. v. Randolph,* 140 A.D.2d 245, 528 N.Y.S.2d 554, 557 (1988); *see also* Williston, § 890.

In *Union City Union Suit Co. v. Miller,* 162 A.D.2d 101, 556 N.Y.S.2d 864 (1990), a case remarkably similar to the instant case, a commercial lessor failed to repair, and eventually removed, a freight elevator from a leased building in violation of the lease. The court held that the lessor had constructively evicted the lessee from one floor of the building and that the lessee had no obligation to pay rent for the second floor.

In other cases, however, the doctrine of constructive eviction was inadequate to achieve a fair result. For example, if a lessor breached a covenant to repair and the lessee made the necessary repairs, the lessee could not offset the cost of those repairs against the rent owed. Even if the cost of repairs exceeded the rent, the lessee was subject to eviction for failure to pay rent. *See King v. Firm,* 3 Utah 2d 419, 424, 285 P.2d 1114, 1117 (1955) (citing 3 Williston, *A Treatise on the Law of Contracts* § 887 F (rev. ed.)).

Although the fiction of constructive eviction served the useful purpose of ameliorating the harshness of the rule of independent covenants while continuing to use recognized common law vocabulary and concepts, even the doctrine of constructive eviction had limited capacity to achieve fairness. With the evolution from an agrarian to an urbanized, industrialized society, improvements on the land became relatively more important. Improvements such as houses, apartments, office and commercial buildings, and plants and factories came to have greater value to the lessee than did the land itself. These developments have required courts to reassess the doctrines that underlie and define the legal rights and liabilities of parties to a lease.

In 1985, this Court recognized that certain property law rules that historically governed the leasing of land had become obsolete. In *Williams v. Melby,* 699 P.2d 723, 727 (Utah 1985), this Court observed that the realities of the expectations and relationships of lessors and lessees had so changed from earlier times that it was necessary to recognize that a "residential lessee does not realistically receive an estate in land. Rather, the lessee's rights, liabilities, and expectations are more appropriately viewed as governed by contract and general principles of tort law." On the basis of tort law, a landlord was held to have a higher duty of due care to a tenant than property law had historically imposed. We observed that because the purposes for leasing land had evolved, the common law tort duties of landlords had been expanded from what they had been under the common law in almost all states. *See id.* at 726–27; *Javins v. First Nat'l Realty Co.,* 428 F.2d 1071, 1074 (D.C.Cir.1970) ("When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also

adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation and maintenance.").

Four years after deciding *Williams,* this Court again reflected on the changes in circumstances affecting the leasing of real estate, this time in the context of a commercial lease, and held that principles of contract law rather than property law governed the law of damages in computing a lessee's liability for damages for breach of a lease. *Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896 (Utah 1989). The Court stated:

> The trend rule [that the lessor has an obligation to mitigate] reflects the more modern view that the leases are essentially commercial transactions, contractual in nature.
>
> . . . .
>
> ... [T]he traditional rule also stems from the ancient concept that a leasehold is a complete conveyance of real property ... and the landlord simply has no present ownership interest in the property during the lease term.... *Today, leases are generally viewed as commercial transactions in which the landlord retains the estate but permits its use by another on specified conditions; leases are seldom seen as complete conveyances of the underlying property for a specified term.*

*Id.* at 904–05 (emphasis added).

The same rationale was one of the important premises of this Court's decision in *Wade v. Jobe,* 818 P.2d 1006 (Utah 1991). In *Wade,* we again observed that the reality of modern residential leases is that lessees bargain for the use of the structures, facilities, and services attached to the land rather than the land itself, so that the appurtenances to the land are the more important feature of the lease. *Id.* at 1009; *see Williams v. Melby,* 699 P.2d 723, 727 (Utah 1985); *Javins v. First Nat'l Realty Corp.,* 428 F.2d 1071, 1074 (D.C.Cir.1970). We held that a contract concept of implied warranty should be extended to residential leases in the form of an implied warranty of habitability and that the covenant to pay rent was dependent on the lessor's compliance with the implied warranty of habitability. *Wade,* 818 P.2d at 1010. The ruling in *Wade* is consistent with the positions taken on similar issues in a majority of states. *E.g., Javins,* 428 F.2d at 1074; *Boston Housing Auth. v. Hemingway,* 363 Mass. 184, 293 N.E.2d 831 (1973); *Park West Management Corp. v. Mitchell,* 47 N.Y.2d 316, 418 N.Y.S.2d 310, 391 N.E.2d 1288 (1979); *Kamarath v. Bennett,* 568 S.W.2d 658 (Tex. 1978).

We find that the principles announced in *Wade* in the context of residential leases are equally applicable to the commercial context. In addition, several other states have held that under certain circumstances, commercial lessees may withhold rent. One group of states, which includes Texas and New Jersey, holds that covenants in commercial leases are mutually dependant. Texas offers the most expansive protection for commercial leases; it extends to commercial lessees all protections available to residential lessees, including an implied warranty of suitability that the leased premises are suitable "for their intended commercial purpose." *Davidow v. Inwood North Professional Group—Phase I,* 747 S.W.2d 373, 377 (Tex.1988). The court in *Davidow* reasoned that a commercial lessee should have the same protections as those accorded a residential lessee and that contract principles rather than medieval property principles should apply. *See also Gober v. Wright,* 838 S.W.2d 794 (Tex.Ct.App.1992); *Kerrville HRH, Inc. v. City of Kerrville,* 803 S.W.2d 377 (Tex.Ct.App.1990); *Henry S. Miller Mgmt. Corp. v. Houston State Assocs.,* 792 S.W.2d 128 (Tex.Ct.App.1990); *Coleman v. Rotana, Inc.,* 778 S.W.2d 867 (Tex.Ct.App. 1989). Although it stopped short of providing the same broad protections as Texas, the New Jersey Supreme Court held that "fair treatment for tenants with respect to latent defects remediable by the landlord ... require[s] imposition on [the landlord] of an implied warranty against such defects." *Reste Realty Corp. v. Cooper,* 53 N.J. 444, 251 A.2d 268, 273 (1969). A New Jersey appellate court thereafter noted that the state supreme court's decision heralded "the demise of the doctrine of independent covenants." *Ringwood Assocs. v. Jack's of Route 23, Inc.,* 166 N.J.Super. 36, 398 A.2d 1315, 1319 (App.Div.1979).

A second group of states does not recognize implied warranties in commercial leases but nevertheless holds that covenants in commercial leases may be mutually dependent. Massachusetts and Indiana hold that the covenant to pay rent and the covenant to repair may be mutually dependent. *Erhard v. F.W. Woolworth Co.*, 374 Mass. 352, 372 N.E.2d 1277 (1978).[3] See *Welborn v. Society for Propagation of Faith*, 411 N.E.2d 1267, 1269 n. 4 (Ind.Ct.App.1980) (citing *Morrison's Southern Plaza Corp. v. Southern Plaza, Inc.*, 252 Ind. 109, 246 N.E.2d 191 (1969), where the court treated the covenants in a commercial lease as mutually dependent). The Supreme Court of Pennsylvania has held that a covenant to pay rent is dependent on all covenants that were significant inducements to the making of the lease. *Teodori v. Werner*, 490 Pa. 58, 415 A.2d 31 (1980).[4]

Both groups of cases recognize that the covenant to pay rent under a commercial lease is dependent on the lessor's compliance with those covenants necessary to provide the lessee with the benefits that were the essence of the bargain as reflected in the lease. This approach relieves a lessee of the obligation to abandon the premises, as is necessary under the fiction of a constructive eviction. By making the lessee's covenant to pay rent dependent on the lessor's performance of essential covenants, the legal analysis can focus, as it should, on the essential elements and purposes of the bargain between the lessor and the lessee. By employing contract principles, a court's analysis of a dispute between a lessor and a lessee should provide a more fair, realistic, and forthright analysis of whether a lessee may abate rent. The result reached on such an analysis should better comport with modern leasing practices and expectations than the result under an analysis based on the principle of independent covenants as modified by the doctrine of constructive eviction. To the extent that *King v. Firm*, 3 Utah 2d 419, 285 P.2d 1114 (1955), is inconsistent with this conclusion, it is overruled.

Not all breaches of covenants by a lessor, however, justify a lessee in withholding rent. Only a significant breach of a covenant material to the purpose for which the lease was consummated justifies a lessee in abating rent. Temporary or minor breaches of routine covenants by a lessor do not. Thus, if a breach has little effect on the essential objectives of the lessee in entering into the lease, the lessee may not withhold rent. Restatement (Second) of Property § 7.1, cmt. c (1977) states that a covenant is not a significant inducement if "the landlord's failure to perform his promise has only a peripheral effect on the use of the leased property by the tenant." *See also Ringwood Assoc. Ltd. v. Jack's Route 23, Inc.*, 166 N.J.Super. 36, 398 A.2d 1315, 1320 (App.Div. 1979). A significant inducement means the "performance of [a] promise [that has] a significant impact on the benefits the tenant anticipated he would receive under the lease." Restatement (Second), § 7.1 cmt. c. Thus, in assessing whether a lessor's breach is sufficient to justify the withholding of rent, a lessee first and a court later, if necessary, must gauge the materiality of the breach in light of the lessee's purpose in leasing the premises. Relevant to that determination may be whether the breach has a significant effect on the rental value of the premises. *See Davidow v. Inwood North Professional*

---

**3.** A federal district court for the district of Massachusetts construed *Erhard* to mean "explicit[ly]" that covenants within a commercial lease are mutually dependent. *Reed v. United States Postal Service*, 660 F.Supp. 178, 183 (D.Mass.1987). In *Holmes Realty Trust v. Granite City Storage Co.*, 25 Mass.App.Ct. 272, 517 N.E.2d 502 (1988), a Massachusetts state court stopped short of adopting the federal district court's holding but ruled that "the covenant to pay rent [in a commercial setting] is not necessarily independent." *Id.* 517 N.E.2d at 505. It concluded that "there is great doubt whether ... [the doctrine that covenants are independent] remains a correct statement of Massachusetts law," because leases are for more than just the land. *Id.*

**4.** The *Teodori* court concluded that the doctrine of independent covenants rests on outdated property principles rather than on contract principles, which better capture the relationship of parties in many modern leases. *Id.* (relying upon *McDaniel v. Mack Realty Co.*, 315 Pa. 174, 172 A. 97, 98 (1934) (holding that a commercial lessee could retain possession and abate rent in response to a landlord's material breach of covenant)).

*Group—Phase I,* 747 S.W.2d 373, 377 (Tex. 1988).

In sum, we hold that the lessee's covenant to pay rent is dependent on the lessor's performance of covenants that were a significant inducement to the consummation of the lease or to the purpose for which the lessee entered into the lease. As noted above, this conclusion is consistent with our holding in *Wade v. Jobe,* 818 P.2d 1006 (Utah 1991), and with the direction in which the law in this state has been evolving with respect to the nature of the legal duties that parties to a lease have. *See Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896 (Utah 1989); *Williams v. Melby,* 699 P.2d 723 (Utah 1985).

██ Holding Barton liable for the full amount of rent when a significant part of the leased premises was practicably unusable for the purpose for which the premises were leased would be tantamount to requiring that Barton pay for something he could not use in the manner intended when the lease was executed, given the nature of his business and the nature of the building. Tsern knew that an operable elevator was essential to Barton's use of the second floor and that the lack of an operable elevator was not simply a matter of inconvenience. Tsern's promise to repair the elevator was a significant inducement to Barton to enter into the lease. Indeed, on several occasions before the lease was signed, Barton explicitly told Tsern that the business required an operable elevator. The absence of an operable and safe elevator had more than a peripheral effect on Barton's use of the premises; it impaired Barton's ability to conduct its business on the premises. It follows that Tsern was entitled to receive rent equal to the value of the premises without an operable freight elevator.

██ In computing the amount of rent abatement or reimbursement to which a lessee is entitled, the trial court followed the formula set out in *Wade v. Jobe,* 818 P.2d 1006, 1012–13 (Utah 1991). Under that approach, the lessee is entitled to abate rent by an amount equal to the reduced value of the premises due to the lessor's breach. *Id.* at 1012–13.

Apparently anticipating that this Court might adopt the principle of dependent covenants, Tsern argues that the rule should be applied only prospectively because it would constitute an abrupt departure from prior law on which Tsern has relied. While the adoption of the principle of dependent covenants is a departure from prior law, the result we reach in this case is not different from the result we would have reached had we applied the rule of constructive eviction. *See Thirteenth & Washington Sts. Corp. v. Neslen,* 123 Utah 70, 254 P.2d 847 (1953); *Union City Union Suit Co. v. Miller,* 162 A.D.2d 101, 556 N.Y.S.2d 864 (1990). For that reason, we decline to hold that the rule of dependent covenants should not be applied in this case.

## III. EXERCISE OF OPTION TO PURCHASE AND DUTY TO REPAIR

██ Tsern also argues that the trial court erred in ruling that Tsern's obligation to repair the elevator continued after Barton exercised the option to purchase the building because his obligations under the lease were extinguished by Barton's exercise of the option. The general rule is that a lessee's exercise of an option to purchase terminates the lease and all *future* obligations under the lease. *Park West Village, Inc. v. Avise,* 714 P.2d 1137, 1141 (Utah 1986); *see also Ruark v. Peterson,* 30 Colo.App. 162, 491 P.2d 75, 77 (1971); *Summa Corp. v. Richardson,* 93 Nev. 228, 564 P.2d 181, 185 (1977); *Cities Serv. Oil Co. v. Viering,* 404 Ill. 538, 89 N.E.2d 392 (1949); 51c C.J.S. *Landlord and Tenant* § 82(1)(b); 49 Am.Jur.2d *Landlord and Tenant* § 407.

The general rule is illustrated by *Park West Village, Inc. v. Avise,* 714 P.2d 1137 (Utah 1986), where a lessee sought to hold a lessor liable for the expenses of installing a septic tank on the property. The Court ruled that the lessor was not liable for the expenses because the installation of a septic tank was not required until after the lessee had exercised its option to purchase the property. Exercise of the option extinguished all future obligations under the lease.

■ The present case is distinguishable. Tsern's obligation to repair the elevator existed prior to the time .Barton exercised its option to purchase the property and should have been performed prior to that time.

■ Tsern's obligation to repair the elevator was also included in the contract for the sale of the premises. Once the option had been exercised and the parties took on the relationship of vendor-vendee, the rights of the parties were determined by the contract to sell. *Willard v. Tayloe*, 75 U.S. (8 Wall) 557, 19 L.Ed. 501 (1870); *Foote v. Taylor*, 635 P.2d 46, 48 (Utah 1981); *Cities Serv. Oil Co. v. Viering*, 404 Ill. 538, 89 N.E.2d 392, 402 (1949); *see also Park West Village, Inc. v. Avise*, 714 P.2d 1137, 1141 (Utah 1986); *Summa Corp. v. Richardson*, 93 Nev. 228, 564 P.2d 181, 185 (1977). But that duty did not affect Barton's right to abate rent under the lease. In short, Barton's exercise of the purchase option did not release Tsern from his obligation to repair the elevator.

## IV. REPAIR OF THE ELEVATOR

Tsern's final argument is that the trial court's ruling on Tsern's third-party claim against Kimball Elevator Company, that Kimball fulfilled its contract to repair the elevator to *"safe operating condition,"* is inconsistent with the court's ruling on Barton's primary claim against Tsern that Tsern failed to repair the elevator to *"good working order,"* as the lease required. Tsern's position is that Kimball could not have fulfilled its contract with Tsern without putting the elevator in "good working order." The argument is correct only if the term "good working order" in the lease means the same as the term "safe operating condition" in Kimball's contract to repair.

■ The two phrases are not recognized terms of art; they have no readily understood meaning outside of the contracts in which Tsern inserted them. Accordingly, the trial court's decision must be reviewed under the clearly erroneous standard. Utah R.Civ.P. 52(a); *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1286 (Utah 1993). This imposes a heavy burden on the party bringing the appeal. "To mount a successful challenge to the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below." *Reid v. Mutual of Omaha Ins.*, 776 P.2d 896, 899 (Utah 1989). Tsern has in no way met this burden.

After Tsern contracted with Kimball Elevator, Kimball, pursuant to Tsern's express verbal instruction, did the barest minimum to make the elevator "run up and down." Kimball informed Tsern that some eight additional repairs should be made and that installation of a new elevator was advisable. Tsern refused to authorize Kimball to make the necessary repairs and informed Kimball not to call for an inspection of the elevator by a state inspector and not to inform Barton of Kimball's recommended additional repairs. Thus, Kimball did what Tsern directed and nothing more because Tsern was unwilling to stand the expense of those additional repairs. Brent Russon of Kimball testified that completion of repairs authorized by Tsern made the elevator safe and operable for the time being.[5] Kimball emphasized on several occasions that the repair work it was allowed to do was the bare minimum. Kimball, of course, complied with Tsern's demand that the cost of the repairs not exceed $5,000. Kimball made clear that additional repairs were necessary if Tsern expected the elevator to pass inspection. Tsern refused to agree to the additional repairs and accepted that the elevator would not pass inspection.

In contrast to his contract with Kimball, Tsern's agreement with Barton required that the elevator be in "good working order." Relying on the testimony of Joseph Nicksic, the senior elevator inspector for the State of Utah, the trial court found that "[w]hile 'good working order' is not the same as 'up to code,' it encompasses and mandates more than mere function of the elevator." The "mere function of the elevator" was all Tsern

---

5. It should be noted that Kimball was the only elevator company willing to do the work. Due to its poor condition, Otis, Montgomery, and Schneider all refused to work on the elevator.

expected from Kimball. In inspecting the elevator, the state inspector found nine violations of the state code. On the basis of these violations, he shut down the elevator and prohibited anyone from operating it. The defects resulting in those violations would have been repaired had Tsern been willing to spend the money that was required.

After two days of testimony, the trial court concluded that Kimball had fulfilled its contract and that Tsern had not complied with its covenant to provide an elevator in good working order. We are not at liberty to reject the trial court's rulings only on the basis of an unsubstantiated intuitive belief that the finding is inaccurate.

The trial court's holding may also be affirmed on somewhat different grounds. *See Buehner Block Co. v. UWC Assoc.*, 752 P.2d 892, 894–95 & n. 2 (Utah 1988); *Branch v. Western Petroleum, Inc.*, 657 P.2d 267, 276 (Utah 1982).

A more detailed inquiry into the nature of the contractual relationship between Kimball and Tsern shows that the contract that Tsern and Kimball signed for repair of the elevator was substantially modified by explicit directions that Tsern gave to Kimball not to make a number of repairs that Kimball knew were necessary to pass inspection and make the elevator safe.[6] The contract itself was a time and materials contract, and Tsern required that he give specific authorization for all work costing more than $5,000. The written contract provided for Kimball to undertake at least eight specified repairs, and the work was to pass a state inspection. Once Kimball's repairman began to work on the elevator, Kimball came to realize the extreme state of the elevator's disrepair. Kimball informed Tsern of additional necessary repairs, but Tsern refused to spend more than $5,000 and would not pay the additional funds for specified repairs. In short, Tsern ordered Kimball to limit the work only to what was needed to make the elevator run up and down; he indicated that he no longer

wished the elevator to be inspected and indeed told Kimball not to tell that to Barton.

By changing the terms of the service contract, Tsern and Kimball altered the contract itself and the term that it had employed—"safe operating condition"—became meaningless. Kimball made only those repairs specified by Tsern because Tsern would pay for nothing else. Thus, Kimball's obligations under its altered agreement with Tsern were considerably less than Tsern's obligation to repair the elevator to "good working order" pursuant to its contract with Barton.

## V. ATTORNEY FEES AND INTEREST

On its cross-appeal, Barton argues that the trial court's award of $100,000 in attorney fees was unreasonably low. Barton requested $160,000 in fees. The trial court refused to award Barton fees for paralegal and clerk time and for a frivolous rule 11 motion. Barton does not challenge the court's deletion of these items from the award but contends that after deleting them, the court should have awarded Barton $148,000 in fees rather than $100,000. Barton's argument is based on the court's statement that it had "no reason to believe that the fees in this case ... were not all reasonable and necessary." Barton's focus on this sentence fails to capture the reasoning of the court's order.

The trial court necessarily has broad discretion in determining the amount of a reasonable attorney fee and will not be reversed unless the court abuses its discretion. *Dixie State Bank v. Bracken,* 764 P.2d 985, 991 (Utah 1988); *Paul Mueller Co. v. Cache Valley Dairy Ass'n,* 657 P.2d 1279, 1287 (Utah 1982); *Alexander v. Brown,* 646 P.2d 692, 695 (Utah 1982); *In re Smith's Estate,* 108 Utah 537, 162 P.2d 105, 111 (1945). The trial court's discretion arises from the fact that it is in a better position than an appellate court to gauge the quality and efficiency of the representation and the complexity of the litigation.

---

6. Chief Justice Zimmerman and Justice Howe erroneously assert that the trial court has not made certain factual findings which are critical to our holding. They would have us remand for additional findings of fact. In fact, the trial

court's second amended findings of fact and conclusions of law contain all the factual findings necessary to sustain a conclusion of modification. We do agree, however, that contract modification is a finding of fact.

■ The trial court considered the factors set out in *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985), in fixing attorney fees:

[1] The difficulty of the litigation, [2] the efficiency of the attorneys in presenting the case, [3] the reasonableness of the number of hours spent on the case, [4] the fee customarily charged in the locality for similar services, [5] the amount involved in the case and the result attained, and [6] the expertise and experience of the attorneys involved.

Although the court ruled that time billed for clerks, for paralegals, and on a rule 11 motion should be deducted from the fees requested, the court did not attribute a dollar amount to the items and did not "go through with a calculator and determine exactly what amounts to deduct from the requested fees," because the court was not "attempting to take out specific dollars." The trial court also reduced Barton's award for other reasons.

■ However, a trial court is not required to use a set formula or precise mathematical calculation in determining the amount of an award but may take into account a wide variety of qualitative factors. *See Dixie State Bank v. Bracken*, 764 P.2d 985, 989–90 (Utah 1988). Although the trial court stated that it had no reason to believe that the fees billed were not all reasonable, it nevertheless ruled that Barton's attorneys were somewhat inefficient in their use of time on some matters. Accordingly, the court further reduced the award and ruled that $100,000 was a reasonable award of fees.[7] In our opinion, that did not exceed the bounds of the court's discretion.

Barton also disputes the trial court's award of interest to Tsern on the purchase price from the date the option was exercised until the day title was conveyed. Barton argues that interest for this time should not be awarded because of Tsern's refusal to repair the elevator, thereby prolonging the closing of the sale. During this period, however, Barton had full possession of the premises, had no obligation to pay rent, and had not yet tendered the purchase price.

■ On the exercise of an option to purchase, a seller is entitled to interest on the purchase price, notwithstanding delays in closing caused by the seller if the buyer is in possession of the premises during that time. *Pack v. Hull Dev. Co.*, 667 P.2d 39, 40 (Utah 1983); *Blomquist v. Bingham*, 652 P.2d 900, 902 (Utah 1982); *Amoss v. Bennion*, 23 Utah 2d 40, 456 P.2d 172, 174–75 (1969). If the buyer does not have possession and the seller causes the delays, the date from which interest is computed is postponed until the date of possession. *Blomquist*, 652 P.2d at 902; *Amoss*, 456 P.2d at 174. Because Barton was in possession during the disputed time, it follows that interest should be paid on the purchase price from the time the option was exercised.

■ Finally Barton argues that the trial court should have deducted its offsets from the purchase price before calculating the interest owed Tsern. The Utah Court of Appeals has held that offsets should be deducted before interest is calculated when an interest bearing award arises at the same time as the offsets. *See Brown v. Richards*, 840 P.2d 143, 152 (Utah Ct.App.1992). Here, however, the awards arose at different times. Tsern's right to interest on the purchase price accrued when the option was exercised October 29, 1992. Barton's right to interest on its largest offset, the cost of repairing the elevator, did not accrue until June 4, 1993. Deducting this amount from the interest owed Tsern on the purchase price when Tsern's right to the interest vested several months previously would be unfair. In sum, the trial court ruled correctly.

Affirmed.

DURHAM, J., concurs.

---

7. In determining that Barton's attorneys inefficiently used their time, the trial judge apparently took into consideration the fact that Barton's attorneys billed $170,000 in fees in the same time period for which Tsern's attorneys billed only $70,000 in fees. We note, however, that that disparity by itself does not necessarily indicate an inefficient use of time or excess time spent on the case.

RUSSON, Justice, concurring in part and concurring in the result:

I concur with the lead opinion but with the following exception. In regards to part IV of the lead opinion, I concur with Associate Chief Justice Stewart's affirmance of the trial court's judgment but disagree with his determination that there had been a modification of the contract between Kimball and Tsern. As to the latter point, I agree with the reasoning of Chief Justice Zimmerman and Justice Howe in their dissents.

In concurring with Associate Chief Justice Stewart's affirmance in part IV, I do so on the basis of the trial court's finding of fact No. 31, which specifically found that the elevator failed to satisfy the agreement between Richard Barton Enterprises and Tsern. It specifically states:

> This Court finds that the condition of the elevator failed to satisfy the Agreement of the parties. The Agreement required an elevator in "good working order," plaintiffs were therefore entitled to an elevator in "good" and "working" order. The most that can be said of the elevator in question is that it was "operational" for brief periods. It was neither in "good" nor "working" order.

While it is true that the trial court also found plaintiffs' witness, Mr. Nicksic, to be the most credible witness on the point of "good working order," the trial judge does not state that she relies solely upon his testimony in making her finding. In fact, the trial court's finding No. 31 analyzed "good working order" and stands on its own. Just because the trial judge found witness Nicksic to be the most credible witness on the point, that does not necessarily mean that the trial judge relied upon his testimony totally in making her finding.

ZIMMERMAN, Chief Justice, concurring and dissenting:

I join Justice Howe in concurring and dissenting as to part IV of the lead opinion. I find the logic of the lead opinion reasonable as to a basis for finding that Kimball's obligations under the modified contract were considerably less than Tsern's obligations to repair the elevator pursuant to its contract with Barton. However, I agree with Justice Howe that for such a rationale to provide a basis for affirmance, certain findings needed to be made by the trial court which were not made and upon which the evidence before us is conflicting.

Specifically, as Justice Howe separately notes, the record is devoid of the factual finding that Kimball and Tsern modified their elevator repair contract. Under our case law, "[t]rial courts are given primary responsibility for making determinations of fact" because trial judges are "in the best position to assess the credibility of witnesses and to derive a sense of the proceedings as a whole, something an appellate court cannot hope to garner from a cold record." *State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994). The lead opinion ignores this allocation of responsibility between trial and appellate courts by supplying its own factual finding that a contract modification occurred. Even if we were to view the issue of whether a contract was modified as a question of law, we would assign the responsibility for initially making that highly fact-dependent determination to the trial court and give it a great deal of discretion in doing so. *See id.* at 937–39. In short, appellate courts should not usurp the freedom given to trial judges "to make decisions which appellate judges might not make themselves ab initio but will not reverse." *Id.* at 937–38.

I understand that this case has dragged on and that the record is voluminous, as Justice Stewart notes, but none of that justifies our usurping the trial court's legitimate role in an effort to produce, today, the result we think appropriate, even if we think the trial court might reach the same result after remand.

For the foregoing reasons, I join Justice Howe in voting for a remand of this case to permit the trial court to make new findings regarding the parties' intent as to the meaning of the words "good working order."

HOWE, Justice, concurring and dissenting:

I dissent as to part IV, REPAIR OF THE ELEVATOR. The trial court held that Kim-

ball fulfilled its contract to repair the elevator to a "safe operating condition" but that Tsern did not meet his lease requirement that he repair the elevator to "good working order." I cannot agree with the explanation offered by the trial court or with the lead opinion of this court as to why these holdings are not inconsistent.

The parties admit that the phrases "safe operating condition" and "good working order" are not recognized terms of art; they have no readily understood meaning outside of the contracts in which the parties inserted them. Because the meaning of these terms is uncertain, the trial court properly considered extrinsic evidence to determine what the parties intended them to mean. *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995).

The parties testified as to their intended meaning of the terms. However, in referring to Joseph Nicksic, the senior elevator inspector for the State of Utah, the court made the following finding:

> The Court finds that Mr. Nicksic, a witness for the plaintiffs, was the most credible witness on the point of "good working order."

The court went on to summarize Mr. Nicksic's opinions as to the meaning of that term.

In interpreting a contract term, the intentions of the parties are controlling. *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991); *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 52 (Utah Ct.App.1995). Where a contract term is not a term of art or one of common use in a particular industry, a trial court should not allow an expert to testify as to what the parties intended the term to mean. *Brecher v. Gleason*, 27 Cal. App.3d 496, 502, 103 Cal.Rptr. 831, 835 (1972) (An "expert cannot tell us the specific intent of the parties in the particular case."); *Fis-*

*cus Motor Freight, Inc. v. Universal Sec. Ins. Co.*, 53 Wash.App. 777, 770 P.2d 679, 682–83 (1989) (insurance underwriter's opinion as to meaning of contract term is not evidence of intent of contracting parties). Thus the trial court erroneously relied on an expert as "the most credible witness" on the meaning of "good working order" as contained in the lease.

Strangely, the lead opinion appears to indirectly concede this trial court error by not even examining it. While it is perhaps true that "[w]e need not rely on the trial court's reasoning in support of its holding but may affirm the trial court's holding ... on different grounds," that does not mean that we should *ignore* the trial court's reasoning in support of its holding.

In addition, the reasoning of the lead opinion's alternative argument is faulty. Without examining the trial court's analysis, the lead opinion simply finds that "Tsern and Kimball effected a modification of their contract and the term that it had employed—'safe operating condition'—became meaningless." The trial court did not make such a finding. On the contrary, it found just the opposite in its written findings of fact: "[T]he duty that ... Kimball Elevator had to perform to Mr. Tsern ... was to provide an operative elevator and a safe elevator."[1]

The lead opinion errs in finding a contract modification, a question of fact solely for the district court. "Whether a contract has been modified by the parties thereto is ordinarily a question of fact for the trier of fact, as where the evidence is conflicting or the terms of the agreement are equivocal or uncertain." *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 679 P.2d 640, 645 (1984) (citing 17 Am. Jur.2d *Contracts* § 465 (1964)); *accord Wolin v. Walker*, 830 P.2d 429, 432 (Wyo.1992) ("The question of whether the alleged modification of the written agreement has been

---

1. The December 12, 1991, repair contract between Tsern and Kimball contained the following notations:

Special Conditions:
1. It is understood that upon completion of specified work, the elevator should be in safe operating condition; hence, the tenant [Barton] may use it safely.

2. Kimball Elevator Company will contact the State Agency for a safety inspection and follow up said inspection.
The trial court found that without advising Barton, Tsern told Kimball not to call for an inspection. Thus although Tsern relieved Kimball of its duty to perform the second special condition of their contract (to have the elevator inspected), the first special condition (to restore the elevator to "safe operating condition") remained in force.

proved by the required quantum of evidence is one to be decided by the trier of fact."); *see also Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1004 (Utah 1991) (Stewart, J., concurring in the result) ("Generally, it is a question of fact as to whether the parties acted in a manner to create implied contractual terms.").

No evidence adduced at trial supports the lead opinion's finding that Tsern and Kimball modified their contract, thus rendering the meaning of the term "safe operating condition" irrelevant. The December 12, 1991, repair contract between Tsern and Kimball required Kimball to bring the elevator up to a "safe operating condition." Kimball did not immediately sign the contract but proceeded to work on the elevator. Nevertheless, Brent Russon, Kimball's General Manager, sent Tsern a letter dated January 22, 1992, in which Russon wrote:

> As authorized in our original proposal, we agreed to complete specified work and deliver the elevator in a safe, operating condition, so that the tenant might use it safely. Please be aware that we have completed this requirement in our agreement.

Thus Kimball bound itself to the "safe operating condition" term, even though Russon later tried to remove it from the contract.[2]

The trial court erroneously relied on an expert as "the most credible witness" in determining that Tsern failed to meet his lease requirement that he repair the elevator to "good working order." Because this error may have infected the final judgment, I would reverse the judgment against Tsern and remand the case to allow the trial court to make new findings of the parties' intent regarding the meaning of "good working order" without relying on Mr. Nicksic's testimony. Only after these new findings are made can the issue of inconsistency which Tsern has raised on this appeal be determined.

---

**2.** On January 24, 1992, Tsern met with Russon to have Russon sign the contract. At first Russon refused to do so. When Tsern insisted, Russon consulted his attorney. Russon then blacked out the words "safe operating condition" and "safely," replaced them with "serviceable" and "to move freight," and signed the contract. Tsern objected and refused to initial the changes.